**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
        sbogdanovich@bursor.com
        idiaz@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW CASSELL, ALAN LIU, and ANGEL CERRATO, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>      v.<br><br>UBISOFT, INC.<br>                Defendant. | Case No.  2:24-cv-03058-DAD-CSK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Matthew Cassell, Alan Liu, and Angel Cerrato ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Defendant Ubisoft, Inc. ("Defendant" or "Ubisoft"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF ACTION

1.      Imagine you buy a pinball machine, and years later, you enter your den to go play it, only to discover that all the paddles are missing, the pinball and bumpers are gone, and the monitor that proudly displayed your unassailable high score is removed. Turns out the pinball machine manufacturer decided to come into your home, gut the insides of the pinball machine, and remove your ability to play the game that you *bought* and *thought* you owned. Even though you paid full price to receive this game, you never knew that the manufacturer could come in one day, and, without your control, leave you with a skeleton of what you thought you paid for. This is exactly what happened to thousands of Ubisoft consumers, including Plaintiffs Cassell, Liu, and Cerrato when, on March 31, 2024, Defendant decided to shut down the servers for its video game, *The Crew* (the "Product" or the "Game").[1]

2.      This decision resulted in Defendant completely destroying the Game, which totally barred consumers' access to the product they paid money for. To further rub salt on the wound, Defendant decided that it would not provide consumers with the basic courtesy of leaving intact the single-player version of the Game so that the thousands of consumers who paid hard-earned money for *The Crew* could at least enjoy *some* portion of this beloved Game offline.

3.      Defendant duped consumers in two ways. First and foremost, Defendant misled consumers by telling them they were *buying* a game, when in fact, all they were renting was a *limited license* to access a game that Defendant choose to maintain at its own *noblesse oblige*. In other words, consumers thought they were obtaining the *full* bundle of sticks we know as property ownership; not the brittle bundle Defendant actually conveyed. In many cases, this deception was

---

[1] The Product only includes the game *The Crew*, not subsequent spin-off video games such as *The Crew 2*.

compounded by the fact that many gamers, like Plaintiffs, *bought* physical disks storing the Game data, which reasonably made them believe that they could input that disk into their computer or game console and play the game whenever they wanted.  Defendant also reinforced this belief by including language on the Product packing stating that the *online* portion of the Game could be retired, thereby representing to consumers that an *offline* portion of the Game existed that would be unaffected.  Second, through the totality of the Product's packaging, Defendant falsely represented that *The Crew* itself was encoded onto physical disks consumers could buy or the digital files consumers could pay to download.  However, in reality, *The Crew* itself resided on a remote server, and the physical disks and downloaded files consumers paid for were more akin to a key they could use to open the gates of this remote server, which Defendant could one day decide to fail to maintain.  Defendant intended consumers to rely on its representations and omissions in making their purchasing decisions.  Through its conduct, Defendant has violated California state consumer protection laws.

4.    Had Plaintiffs and all other similarly situated consumers known the truth of what they were receiving when they paid money for the physical copy of *The Crew*, they would have paid substantially less for the Product or would not have purchased it at all.

5.    Additionally, many consumers also made in-game purchases while playing *The Crew*.  In order to make these in-game purchases, consumers had to purchase what Defendant called Crew Credits.  Consumers could purchase Crew Credits "through the in-game store or the Ubisoft Store" and could use Crew Credits to "buy character cosmetics, vehicles, vehicle customisations [sic], vanities, and Spare Parts."[2]

6.    Consumers who purchased Crew Credits and still had remaining, unredeemed Crew Credits at the time the Game was shut down lost access to their Crew Credits.  Further, consumers did not receive a refund for the money they spent on these lost Crew Credits.

---

[2] UBISOFT, *Currencies in The Crew Motorfest*, https://www.ubisoft.com/en-us/help/the-crew-motorfest/purchases-and-rewards/article/currencies-in-the-crew-motorfest/000105225#:~:text=Crew%20Credits%20can%20be%20purchased,%2C%20vanities%2C%20and%20Spare%20Parts.  Although this source references currencies available on a subsequent game, *The Crew Motorfest*, Crew Credits were also available for purchase for *The Crew*.

7.      Both the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, and Cal. Civ. Code § 1749.5 prohibit companies, like Defendant, from selling pre-paid cards or gift cards — which also include "other payment code or device" or "electronic promise" — that will expire.

8.      Therefore, by shutting down the Game, resulting in consumers losing access to their unredeemed Crew Credits, Defendant violated both EFTA and Cal. Civ. Code § 1749.5.

9.      Accordingly, Plaintiffs bring their claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (2) violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*); (3) violation of California's False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*); (4) violation of EFTA, 15 U.S.C. §1693 *et seq.*; (5) Fraud; (6) Fraudulent Inducement; (7) Fraudulent Misrepresentation; (8) Breach of Express Warranty; and (9) Breach of Implied Warranty.

**THE PARTIES**

10.      Plaintiff Matthew Cassell is a citizen of California who resides in West Sacramento, California.  Plaintiff Cassell purchased the Product from the Game Stop previously located at 771 Ikea Ct. West Sacramento, CA 95605 in early 2020.  Plaintiff Cassell purchased the physical video game disk version of the Product.  When Plaintiff Cassell purchased the Product, he was under the impression that he was paying to own and possess the video game, *The Crew*, instead of paying for a limited license to use the Game.  Plaintiff Cassell was under the impression that by purchasing the physical Game disk, he acquired the full bundle of ownership rights over the Game, and that he would be able to use the disk to play the game whenever he wanted in the future.  Plaintiff Cassell was also unaware that the Product was continuously operating on servers or "online."  Plaintiff Cassell only became aware that the Product's servers shut down when he and his family attempted to play the Game and it did not work.

11.      Based on Defendant's representations and omissions, Plaintiff Cassell understood that by purchasing the Product, he was purchasing a video game he could continue to play, indefinitely, without risk of the Game being disabled.  Plaintiff Cassell reasonably relied on these

representations and omissions that were part of the basis of the bargain, in that he would not have purchased the Product or would not have purchased it on the same terms if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Cassell suffered, and continues to suffer, economic injuries.

12. Plaintiff Alan Liu is a citizen of California who resides in Madera, California. Plaintiff Liu purchased the Product from the Game Stop located at 2180 W Cleveland Ave #108, Madera, CA 93637, sometime shortly after November 22, 2018, likely as part of a Black Friday or Cyber Monday sale. Plaintiff Liu purchased the physical video game disk version of the Product. When Plaintiff Liu purchased the Product, he was under the impression that he was paying to own and possess the video game, *The Crew*, instead of paying for a limited license to use *The Crew* game. When Plaintiff Liu purchased the Product, he was under the impression that by purchasing the physical Game disk, he acquired the full bundle of ownership rights over the Game, and that he would be able to use the disk to play the game whenever he wanted in the future. Further, Plaintiff Liu purchased a spin-off game of *The Crew*, also published by Defendant, in or around October 2023.

13. Based on Defendant's representations and omissions, Plaintiff Liu understood that by purchasing the Product, he was purchasing a video game he could continue to play, indefinitely, without risk of the Game being disabled. Plaintiff Liu reasonably relied on these representations and omissions that were part of the basis of the bargain, in that he would not have purchased the Product or would not have purchased it on the same terms if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Liu suffered, and continues to suffer, economic injuries.

14. Plaintiff Angel Cerrato is a citizen of California who resides in El Paso De Robles, California. Plaintiff Cerrato purchased the Product from Walmart located at 180 Niblick Rd, Paso Robles, CA 93446, around 2016. Plaintiff Cerrato purchased the physical video game disk version of the Product. When Plaintiff Cerrato purchased the Product, he understood the Game was an online game, but because he purchased a physical version of the Game, he was under the impression that he was paying to own and possess the video game, *The Crew*, instead of paying for

a limited license to use *The Crew* game. When Plaintiff Cerrato purchased the Product, he was under the impression that by purchasing the physical Game disk, he acquired the full bundle of ownership rights over the Game, and that he would be able to use the disk to play the game whenever he wanted in the future. Plaintiff Cerrato also purchased Crew Credits for use on the Game, as recently as sometime in 2017. At the time Defendant shut down the Game, Plaintiff Cerrato still had remaining, unused Crew Credits on *The Crew*. After the shutdown, Plaintiff Cerrato lost access to his Crew Credits. Defendant did not refund him for these unredeemed Crew Credits that were expired at the time the Game was shut down.

15.     Based on Defendant's representations and omissions, Plaintiff Cerrato understood that by purchasing the Product, he was purchasing a video game he could continue to play, indefinitely, without risk of the Game being disabled. Plaintiff Cerrato reasonably relied on these representations and omissions that were part of the basis of the bargain, in that he would not have purchased the Product or would not have purchased it on the same terms if the true facts had been known. As a direct result of Defendant's material misrepresentations and omissions, Plaintiff Cerrato suffered, and continues to suffer, economic injuries.

16.     Defendant Ubisoft, Inc. is a California corporation with its principal place of business in San Francisco, California. Defendant is the United States publisher and distributor of *The Crew*.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

18.     This Court has general personal jurisdiction over Ubisoft, Inc. because it is domiciled in this state. Ubisoft, Inc. is responsible for publishing and distributing *The Crew*.

19.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Video Games; From Past to Present

20.     Home-use videogame consoles emerged in the 1970s.[3]  Initially, videogame consoles stored a limited number of games directly on their hardware.  Later, the development of game cartridges and disks allowed players to interchange games with consoles.[4]  Compatibility between game cartridges and disks (software) and videogame consoles (hardware) became important.[5]  As consoles evolved, newer consoles became incompatible with older games. However, incompatibility did not render older video games obsolete: so long as players kept their old consoles, they could play their old games.[6]  In this way, traditional games theoretically last forever, so long as the software and hardware remain physically intact.

21.     In the 1990s, general internet use by the public increased.  Over time, developers used the internet to initiate massive multiplayer online role-playing games (MMORPG).[7]  These games used the internet as their platform, creating a space where individuals could play a game while socially interacting with one another.[8]  Today, every major console has internet connectivity, and most games contain internet-based features.

22.     When players use the internet in games, they are using the internet hosted by the game company's servers.[9]  Unlike in the past, where users could continue playing old games if they continued using their old consoles, players now have to rely on the company to continue hosting

---

[3] Stellan Johansson, *Media and Culture: An Introduction to Mass Communication*, *The Evolution of Electronic Games*, (2010), https://courses.lumenlearning.com/suny-massmedia/chapter/10-2-the-evolution-of-electronic-games/.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

the game in order to continue having access.[10]  If the company's servers for a particular game go down or are shut down, the games become unplayable unless there is an offline version.

**B.    Background on *The Crew***

23.    *The Crew*, an arcade-action social racing game released in 2014,[11] gives users an "opportunity to drive anywhere in an idealized, shrunken version of the contiguous United States. *The Crew* features a 20-hour campaign that allows players to engage in missions alone, with friends, or with random co-op players.  Upgrades and geographic unlocks are awarded along the way.  In multiplayer, players can create their own crew to compete against other teams in races, take-downs, and other challenges."[12]  In short, *The Crew* offers both single-player and multi-player experiences.

24.    *The Crew* video game series was developed and published by Ubisoft.  Ubisoft is a major video game developer responsible for developing and publishing popular titles such as *Assassin's Creed*, *Far Cry*, and *Tom Clancy's* series.

25.    According to a since-deleted blog post by Ubisoft, *The Crew* had 12 million players before it was delisted.[13]  Millions of copies of the game were sold via Ubisoft's digital store,[14] as well as Xbox.com, GameStop, and PlayStation.[15]

26.    Since the debut of *The Crew*, the game has turned into a franchise that includes subsequent spin-off games such as *The Crew 2*, released in 2018,[16] and *The Crew Motorfest*, released in 2023.[17]

---

[10] *Id.*

[11] Colin Campbell, *The Crew is Ubisoft's social racing gambit*, Poligon (June 10, 2023), https://www.polygon.com/2013/6/10/4412894/the-crew-is-ubisofts-social-racing-gambit.

[12] *Id.*

[13] James, Ford, *The Crew reaches 12 million players*, GameReactor (May 6, 2017), https://www.gamereactor.eu/the-crew-reaches-12-million-players/.

[14] *Ubisoft Store*, https://store.ubisoft.com/us/the-crew?lang=en_US.

[15] Marc Marasigan, *Ubisoft is Shutting Down Open-World Racing Game The Crew in March 2024*, MMOS.com (Dec. 16, 2023) https://mmos.com/news/the-crew-shutting-down-in-march-2024

[16] Youssef Maguid, *The Crew 2 Launches June 29*, Ubisoft (March 15, 2018), https://news.ubisoft.com/en-us/article/1UkPHHDKg0yXgS3F4k0aU9/the-crew-2-launches-june-29.

[17] Youssef Maguid, *The Crew Motorfest – Year 2 Brings New Island and More on November 6*, Ubisoft (Sept. 10, 2024), https://news.ubisoft.com/en-ca/article/1fiTcUyVqBbYf2zM4uhaaR/the-crew-motorfest--year-2-brings-new-

27.     Traditionally speaking, video games in single-player mode do not require an internet connection.  However, since *The Crew* operated from a remote server, there was no offline option.  To play, users required a permanent internet connection, even if they purchased a physical copy of the Game instead of a digital copy.

**C.     Dedicated Gaming Servers**

28.     *The Crew* worked off a dedicated game server.  "A dedicated game server provides exclusive resources for hosting a single game, which means all the server's CPU, memory, and bandwidth are allocated to that game alone.  The exclusive allocation eliminates the competition for resources that leads to lag and performance issues."[18]  The benefits of dedicated gaming servers include security, reliability, and stability.[19]

29.     Dedicated gaming servers are helpful for real-time strategy games like *The Crew*.  "Real-time strategy games require players to make quick decisions and micromanage units.  Low latency ensures that commands execute in real time, preventing lag that could disrupt the timing of attacks, resource management, and unit movements."[20]

**D.     Ubisoft Shuts Down *The Crew*'s Servers**

30.     On December 14, 2023, Ubisoft announced it would shut down *The Crew*'s servers on March 31, 2024, meaning that after that date, consumers would lose all access to the Game on all platforms.[21]  And so it happened on March 31, 2024.

31.     The result of the shutdown was the destruction of the Game and players' ability to access and play the Game all together, including both multiplayer and singleplayer options.

---

island-and-more-on-november-
6#:~:text=The%20Crew%20Motorfest%20launched%20in,%2C%20customization%20options%2C%20and%20more.

[18] Nikola Kostic, *What Is a Dedicated Game Server & Why Use One?*, PHOENIXNAP (June 27, 2024), https://phoenixnap.com/blog/dedicated-game-server#:~:text=A%20dedicated%20game%20server%20provides,to%20lag%20and%20performance%20issues.

[19] *Id.*

[20] *Id.*

[21] Matt Wales, *Ubisoft reportedly revoking The Cre from owners' libraries following server shutdown*, EUROGAMER (April 12, 2024), https://www.eurogamer.net/ubisoft-reportedly-revoking-the-crew-from-owners-libraries-following-server-shutdown.

32.     Ubisoft's act caused an uproar among its consumers.  One of the main frustrations that consumers have with the shutdown is that Ubisoft did not provide a preserved, offline, single-player option of the Game, otherwise known as a "patch."

33.     Consumers felt that a patch was warranted, especially since it was possible to play *The Crew* "alone from beginning to end against the computer, without ever engaging with the multiplayer.  Hell, the entire prologue of The Crew *couldn't* be done in multiplayer."[22]

34.     It is a common practice for game developers to create and provide patches of games to their consumers once they decide to shut down a game's servers.  Ubisoft's competitors have done so in recent years.  For example, Polyphony Digital shut down its online servers for its 2017 game, *Gran Turismo Sport*.[23]  Like *The Crew*, Gran Turismo Sport was also a fully online game with both multiplayer and single player options.[24]  However, unlike Ubisoft, Sony did create a patch for its game, meaning consumers can still play the single player option of the game offline.[25]  Further examples of server shut downs where the developer created patches include *Knockout City* published by Velan Studios, *Mega Man X DiVE* published by Capcom, *Scrolls / Caller's Bane* published by Mojang AB, and *Duelyst* published by Bandai Namco Entertainment.[26]

35.     Even Ubisoft has previously shut down online servers for old games while preserving the offline features of the game—such was the case with *Assassin's Creed 2, Assassin's Creed 3*, and more.[27]

36.     But with *The Crew*, Ubisoft only provided a limited remedy for consumers – refunds for those who recently purchased the Game.[28]  This remedy was offered despite the fact

[22] Luke Reilly, *Delisting The Crew Makes Sense, Preventing It From Ever Being Played Again Does Not*, (April 22, 2024), https://www.ign.com/articles/delisting-the-crew-makes-sense-preventing-it-from-ever-being-played-again-does-not.

[23] GT Sport, *Gran Turismo Sport End of Online Services*, https://www.gran-turismo.com/us/gtsport/news/00_1344615.html

[24] *Id.*

[25] Reilly *supra*, note 23.

[26] Stop Killing Games, FAQ, https://www.stopkillinggames.com/faq.

[27] Vikki Blake, *Ubisoft is turning off multiplayer servers for these 15 games*, gamesradar+ (Oct. 6, 2022), https://www.gamesradar.com/ubisoft-is-turning-off-multiplayer-servers-for-these-15-games/

[28] Lawrence Bonk, *Ubisoft is deleting The Crew from players' libraries, reminding use we own nothing*, ᴇɴɢᴀᴅɢᴇᴛ (April 12, 2024), *https://sg.finance.yahoo.com/news/ubisoft-is-deleting-the-crew-from-players-libraries-reminding-us-*

that *The Crew* was released almost a decade ago, so many consumers purchased the Game years ago, and do not qualify for a refund.[29]

**E.      Consumer Response to *The Crew*'s Server Shutdown**

37.      Ubisoft's shutdown of *The Crew* stirred outrage among the gaming community. *The Crew* fans and gamers in general took to the internet to express their criticism and frustration about the decision. The following are messages from *The Crew* fans via Reddit speaking on the issue:

"I will always fight for digital media, I love all the advantages it gives to users all around the world. But this… we need protection on the national or European level, that when we purchase something, we need to have lifetime access to it. No matter what."[30]

"In an ideal world, revoking a license like this should entitle the buyer to a refund. I'm not sure why they're even bothering with doing this. The game isn't playable anymore, so what exactly is the harm in keeping the game available for download for those who have purchased it? Server space? Is Ubisoft really that cheap?"[31]

"thats what i hate about online games….. it's literally like paying full price for a game but instead its a subscription that ends once they decide to pull the plug………"[32]

"They NEED to release an offline patch. It's just unacceptable, they just remove the game and don't let us play. The is anti-consumer and this probably could result in legal actions."[33]

"Are you serious? I just bought the game and ive already played passed the minimum return hours and can't refund it, Uggggg why."[34]

---

we-own-nothing-165328083.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8S8&guce_referrer_sig=AQAAAMV1_TqChKJShMHX7M4XUwXo7ORQ3x8zrFcetAXrMKcxN0kTWml-yrVi9OSje5QxJgKtqfyCUKA2BvpRRMrssveF4qMB9HTh3MPBDz60vq8I8U14oFLFc4qbg8qn5FJWE22zzkW47R3zVSOYDJ8OL117v9ylvWmcEjsNsEQxLPeT.

[29] *Id.*

[30] Mollie Taylor, *Ubisoft is stripping people's licenses for The Crew weeks after its shutdown, nearly squandering hopes of fan servers and acting as a stark reminder of how volatie digital ownership is*, PCGAMER (April 12, 2024), https://www.pcgamer.com/games/racing/ubisoft-is-stripping-peoples-licences-for-the-crew-weeks-after-its-shutdown-nearly-squandering-hopes-of-private-servers-and-acting-as-a-stark-reminder-of-how-volatile-digital-ownership-is/.

[31] REDDIT, *Ubisoft is revoking licenses for The Crew*, Thread, https://www.reddit.com/r/Games/comments/1c11a9j/comment/kz4rn3d/?utm_source=share&utm_medium=web2x&context=3.

[32] REDDIT, *The Crew 1 has been delisted from Steam, and will shut down on March 31, 2024*, Thread, https://www.reddit.com/r/The_Crew/comments/18iaqqi/the_crew_1_has_been_delisted_from_steam_and_will/.

[33] *Id.*

[34] *Id.*

"I still play the crew 1 almost everyday, i hope ubisoft makes the game playable while offline"[35]

"I didn't realize I was only renting this game back when I gave them my 60 dollars"[36]

"If things like this continue why should we be paying full price for games especially if they are digital games. Make it make sense ."[37]

"I wonder about the constitutionality and legality of selling something *without a subscription but as-is* and then taking away the right to enjoy that product… I feel like it should be a violation of contract to do that…"[38]

"That's shit. What happened to the days when you played a game for life. You should be able to play single player off line with the CPU's"[39]

38.      Aside from consumers expressing their frustrations online, they have also taken to supporting world-wide campaigns to effectuate a change in the practice of shutting down games' servers without options to preserve the game for offline play.

39.      For example, YouTuber Ross Scott, the creator of the YouTube channel Accursed Farms launched a campaign called "Stop Killing Games."[40]  The campaign uses *The Crew* as its primary example of the issue at hand.  The "Stop Killing Games" campaign provides consumers with education on the issue of video game server shutdowns, possible solutions (such as game patches), and mechanisms for consumers to take action.[41]  Namely, the website provides users with a link to a European Union initiative called the "European Citizens' Initiative."[42]  This initiative is a call "to require publishers that sell or license videogames to consumers in the European Union (or related features and assets sold for videogames they operate) to leave said videogames in a functional (playable) state."[43]  The goal of pursuing this process is for the European Union to

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] STOP KILLING GAMES, https://www.stopkillinggames.com/.

[41] STOP KILLING GAMES, *FAQ*, https://www.stopkillinggames.com/faq.

[42] STOP KILLING GAMES, *European Citizens' Initiative*, *https://www.stopkillinggames.com/eci.*

[43] EUROPEAN UNION, *European Citizens' Initiative: Stop Destroying Videogames*, https://eci.ec.europa.eu/045/public/#/screen/home.

accept the initiative and create new legislation to address the issue.  At this point, the initiative has over 418,373 signatories throughout the EU.[44]

40.    "Stop Killing Games" also urges consumers in the United States to report the issue of Ubisoft shutting down *The Crew*'s servers to the FTC, [45] to submit answers to a survey to initiate a lawsuit in Brazil, and provides other options for legal action for individuals in other countries.[46]

41.    A petition was also made on change.org which has garnered over four thousand signatures.[47]  The petition's goal is to pressure Ubisoft to provide an offline patch of the Game so users can continue enjoying the Game they paid for.[48]

42.    Fans have resorted to taking matters into their own hands.  A group of modders[49] called The Crew Unlimited has even been trying to "make the game playable again by taking it offline, removing the need for Ubisoft's servers and giving the title a new lease of life on PC."[50]

**F.    Ubisoft's Response to the Consumer Backlash**

43.    Following the consumer backlash on Ubisoft's shutdown of *The Crew*'s servers, Ubisoft published a post on X via the Ubisoft UK account acknowledging[51] it "heard your concerns about access to The Crew games" and committed to create offline modes for the still existing Crew-franchise games, *The Crew 2* and *The Crew Motorfest*.  *See* Figure 1.

---

[44] EUROPEAN UNION, *European Citizens' Initiative: Stop Destroying Videogames*, https://citizens-initiative.europa.eu/initiatives/details/2024/000007_en#

[45] STOP KILLING GAMES, https://www.stopkillinggames.com/countries/united_states.

[46] STOP KILLING GAMES, https://www.stopkillinggames.com/countries.

[47] CHANGE.ORG, *The Crew 1 Shutdown – Bring Offline Mode*, *Ubisoft; Petition*, (Dec. 15, 2023), https://www.change.org/p/the-crew-1-shutdown-bring-offline-mode-ubisoft?redirect=false.

[48] *Id.*

[49] *Forum: What is Modding?*, PLANET COASTER, https://forums.frontier.co.uk/threads/what-is-modding.497176/ (answering the forum question on what modding is by explaining that "Modding is the process of altering a game to suit a particular set of interests, or inserting additional content not created by the game developer.")

[50] Joshua Robertson, *The Crew Fans Are Slowly Making The Game Playable Again*, THEGAMER (April 20, 2024), https://www.thegamer.com/the-crew-fans-slowly-making-game-playable-again/.

[51] @Ubisoft_UK, X (Sept. 10, 2024), https://x.com/Ubisoft_UK/status/1833543517596954728?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwte rm%5E1833543517596954728%7Ctwgr%5E52156233d48e904ddba8698d2737c5f906513c56%7Ctwcon%5Es1_&ref _url=https%3A%2F%2Fwww.thegamer.com%2Fthe-crew-2-motorfest-getting-offline-modes-following-backlash%2F.

1

**Figure 1**



44.    Ubisoft's response shows that Ubisoft is aware that the ability to have lifetime access to a Game consumers pay, for this access is material to consumers when deciding whether to spend their money on a game.  It also shows that Ubisoft has the capability to accommodate shut down servers by creating a permanent offline option for consumers to enjoy indefinitely.

45.    While the announcement was an attempt to appease the angry community, it still failed to make consumers of *The Crew* whole.  It does not remedy the harm already done since *The Crew*, the Game that was *already* shut down, will not be preserved by Ubisoft, only the subsequent Crew games will be preserved.

46.    Once again, consumers saw the issue in Ubisoft's solution and voiced their dislike of the decision which did not account for the harm already done.  *See* Figures 2-4 (showing X user replies to Ubisoft's announcement on X).

**Figure 2**



**Figure 3**



**Figure 4**



**G.    Value of Buying Versus Licensing**

47.    There is an intrinsically higher value consumers place on an owned good versus a
licensed one.  The range of ownership rights that are attached to ownership are the likely
explanation in the difference in valuation between an owned good and a licensed good.

48.    An owned good provides an owner with autonomy over the good – "[i]f we own our
purchases, we are free to make whatever lawful use of them we choose" such as "lend[ing] it,

giv[ing] it away, or donat[ing] it."[52]  "People pay for things that offer them good value for their money.  And ownership is a major component of that value.  Property rights mean that buyers have assurances about their ability to use and enjoy the products they buy."[53]

49.    As such, researchers have found that people attribute a greater value to things that they own, known as the endowment effect.  Specifically, research shows that "we place greater value on the things we own because we own them" more so than things "we simply use" (such as licensed goods).[54]

50.    And even in the wake of the spread of digital goods, such as digital music, videos, books, and video games, consumers were still accustomed to having the assurance of obtaining all their property rights if they chose to purchase a physical good instead of the digital one.  For example: consumers who "wanted fleeting access [to music], [would] listen to the radio for free. But when [they] spent money on music [via a physical good like a CD], [they] got something lasting and transferable."[55]

51.    But as the digital world has evolved even further, this clear delineation of the rights that consumers expect and actually receive when they choose to buy a physical good instead of a digital good is not always accurate.  And further, consumers do not understand "precisely what rights their digital" purchases are offering them.[56]

52.    In this case, consumers believed they were landowners over a copy of the digital world of *The Crew*.  Much like how a homeowner that "buys" a house reasonably believes that purchase entitles them to enter their own house whenever they wish, purchasers of *The Crew* reasonably believed they were free to access the digital world of *The Crew* whenever they wished, by turning on the game, hoping in their virtual racecar, and driving around the Game's many maps.

---

[52] Aaron Perzanowski & Jason Schultz, *Introduction, in* THE END OF OWNERSHIP: PERSONAL PROPERTY IN THE DIGITAL ECONOMY, 1, 10 (2016).

[53] *Id.* at 12.

[54] Aaron Perzanowski & Jason Schultz, *Copies, Clouds, and Streams, in* THE END OF OWNERSHIP: PERSONAL PROPERTY IN THE DIGITAL ECONOMY, 35, 53 (2016).

[55] *Id*. at 53-54.

[56] *Id.*at 54.

However, in fact, consumers were just lowly serfs. Defendant, the lord, would – entirely at their whim – maintain this Game for some period of time. But then the lords would take away the Game and release a new version. To continue living on the land (and keep playing the Game), these serfs would need to pay their lords more money to "buy" a new version of the game.

53. A point of confusion does stem from consumer expectations and traditional understandings of ownership. However, another point of consumer confusion is a direct result of Defendant's misrepresentations and omissions as to what consumers are obtaining from their purchase.

**H.    Defendant's Representations and Omissions Are Actionable**

54. A big issue consumers have with Ubisoft's shutdown of *The Crew* is that despite paying full price for the video Game, Ubisoft completely destroyed consumers' ability to access the Game. An underlying belief that makes consumers angry at Ubisoft's actions is the belief that by paying for *The Crew*, they **owned** the copy of the Game that they purchased and therefore had the right to continue to access the Game via their disk copy instead of being subjected to losing access at Ubisoft's will.

55. Now, why would consumers be confused about what their rights were when paying for a digital copy of the Game? That is because of Ubisoft's omissions and representations to consumers.

56. First, Ubisoft omitted material facts from consumers. Ubisoft did not disclose to consumers that buying a physical disk copy of the Game would not include ownership over the Game, meaning that Ubisoft could and would completely destroy consumers' ability to access the Game at any point. This omission is material given that consumers value a good that they own more than a good that they license. Knowing that the Game could be shut down at any point is a material consideration that would influence consumers' decision about whether to pay the full price for the Game, or whether to even buy it to begin with.

57. The material omission goes to the central function of the product because the central function of a video game is the ability for a user to **play the game they paid for**. The fact that consumers were only licensing the Game, and that Ubisoft could and would shut down the Game's

servers at any point, goes to the Product's central function because it affects a consumer's ability to **play the Game**.

58.     Second, Ubisoft made material misrepresentations about the Game when looking at the totality of *The Crew*'s packaging.  For example, the packaging includes references to "1 PLAYER" functionality.  The packaging also affirmatively misleads consumers into believing that there is an ***offline portion*** of the Game because it warns that "SCEA may retire the ***online portion*** of this game at any time."  *See* Figure 5 (Emphasis added).

**Figure 5**



59.     However, as Defendant's conduct makes clear, there is ***no offline portion*** of the Game, and the entire Game would be retired at their sole discretion.

60.     Specifically, by selling a physical copy of the Game, Ubisoft represented to consumers that they were purchasing a copy of the Game and were therefore obtaining the full bundle of traditional ownership rights over that copy of the Game instead of a license to use the Game.  Because of this, consumers were also misled to believe that they would be able to play the Game at any time with the copy of the Game they purchased simply by putting the disk in their console.

61.     Further, the packaging of the physical copy includes language such as "***NEVER DRIVE ALONE***" and explains various things a player can do while playing the Game.  *See* Figures 6-7.  When taken as a whole, these representations tell consumers that the Game will ***never*** be retired.  However, because Ubisoft shut down the Game's servers, this representation is false in that the Game no longer exists.

**Figure 6**



1

**Figure 7**

2

3

4

5

6

7

8

9

10



11

12

13

14

15

16

17

18

19

20

21

22    62.    These misrepresentations are material because consumers would not have paid the

23    same price for the Product or would not have purchased the Product at all had they known that at

24    the time of purchase the representation that they were paying to purchase a video game was false,

25    given that the video game no longer exists.

26    63.    The same is true for Plaintiffs Liu, Cassell, and Cerrato.  Had Plaintiffs known of

27    Defendant's omitted material facts and misrepresentations, they would not have purchased the

28    Game or would have paid less for it.

## I. Expiring Crew Credits

64.     Consumers, including Plaintiff Cerrato, purchased in-game currency called Crew Credits in order to make in-game purchases.  Consumers purchased Crew Credits "through the in-game store or the Ubisoft Store."[57]  Once purchased, the Crew Credits appeared on the consumer's Game and could be used to "buy character cosmetics, vehicles, vehicle customisations [sic], vanities, and Spare Parts." *Id.*

65.     Crew Credits are available for purchase in packages.  For example, currently, Ubisoft offers 45,000 Crew Credits for $4.99 USD.  *See* Figure 8.  Other packages of varying prices per Crew Credits are available for purchase.  *See id.*

**Figure 8**



66.     Notably, Defendant does not allow Crew Credits to be transferred between the Crew games.[58]  Instead, as seen in Figure 8 above, Crew Credits are sold for particular Crew games — meaning consumers who purchased Crew Credits for *The Crew* could only use Crew Credits for

---

[57] UBISOFT, *Currencies in The Crew Motorfest*, https://www.ubisoft.com/en-us/help/the-crew-motorfest/purchases-and-rewards/article/currencies-in-the-crew-motorfest/000105225#:~:text=Crew%20Credits%20can%20be%20purchased,%2C%20vanities%2C%20and%20Spare%20Parts.  Although this source references currencies available on a subsequent game, *The Crew Motorfest*, Crew Credits were also available for purchase for *The Crew*.

[58] UBISOFT, *Cross-platform content sharing in The Crew Motorfest*, https://www.ubisoft.com/en-us/help/the-crew-motorfest/purchases-and-rewards/article/cross-platform-content-sharing-in-the-crew-motorfest/000105288.

*The Crew*, not *The Crew 2* or *The Crew Motorfest* (and the same applies for purchases of Crew Credits on the subsequent games).

67.     Therefore, once Defendant shut down the Game, consumers lost access to their unused Crew Credits.  In other words, Defendant caused consumers' purchased Crew Credits to expire.

68.     Defendant's act of expiring consumers' Crew Credits is a violation of the EFTA, 15 U.S.C. §1693 *et seq.*  Specifically, this statute prohibits the sale or issuance of gift certificates or gift cards that are subject to expire.  15 U.S.C. § 1693*l*-1(c)(1).

69.     Although the EFTA contains a narrow exception for certain types of cards to expire *after* a five-year period, *see* 15 U.S.C. § 1693*l*-1(c)(2), Defendant's Crew credits do not fall within this exception. To make use of the exception, the party responsible for issuing and expiring the gift card or certificate must disclose the "the terms of expiration [] clearly and conspicuously."  15 U.S.C. § 1693*l*-1(c)(2).  Defendant failed to do so when it sold its Crew Credits.

70.     Crew Credits qualify as either "gift certificates" or as a "store gift card" under  the EFTA.  Under the EFTA:

The term "gift certificate" means an electronic promise that is—

      (i)     redeemable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo;

      (ii)    issued in a specified amount that may not be increased or reloaded;

      (iii)   purchased on a prepaid basis in exchange for payment; and

      (iv)   honored upon presentation by such single merchant or affiliated group of merchants for goods or services.

15 U.S.C. § 1693*l*-1(a)(2)(B)

The term "store gift card" means an electronic promise, plastic card, or other payment code or device that is—

      (i)     redeemable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo;

(ii)    issued in a specified amount, whether or not that amount may be increased in value or reloaded at the request of the holder;

(iii)   purchased on a prepaid basis in exchange for payment; and

(iv)   honored upon presentation by such single merchant or affiliated group of merchants for goods or services.

15 U.S.C. § 1693l-1(a)(2)(C).

71.    Defendant's Crew Credits meet all the elements required to make something a gift certificate or store gift card under the EFTA.  In particular, each individual Crew Credit is its own gift certificate under EFTA, and each consumers' digital wallet of Cred Credits (plural) is a store gift card under EFTA.

72.    As a preliminary matter, Defendant's Crew Credits are an electronic promise to consumers because when consumers purchase Crew Credits, those appear digitally on the consumers' online accounts.  The number of Crew Credits issued by Defendant equals the number of promises Defendant has made to each consumer regarding the consumer's right to redeem the Crew Credits for in-game products.

73.    Next, as to subdivision (i) for both gift certificates and store cards, Consumers can redeem Crew Credits "at a single merchant," which in this case is Ubisoft.

74.    As to subdivision (ii) for both gift certificates and store cards, the Crew Credits are "issued at a specified amount."  The only material difference between the gift certificates or store card definitions is whether or not the Crew Credits can be increased or reloaded.  *Compare* 15 U.S.C. § 1693l-1(a)(2)(B)(ii) *with* 15 U.S.C. § 1693l-1(a)(2)(C)(ii).  As such, each singular Crew Credit qualifies a gift certificate (because it cannot be increased or reloaded), and each consumers' digital wallet of Crew Credits qualifies as a store gift card (because that digital wallet of Crew Credits can be increased and reloaded).  Each individual Crew Credit has a fixed value that cannot be increased.  While a consumer can purchase more Crew Credits, the value of each single Crew Credit does not change.  For example, if a consumer redeems one Crew Credit for an in-game product, the consumer can only redeem that Crew Credit for a product that Ubisoft values at no more than one Crew Credit.  Crew Credits are not reloadable because each purchase for Crew

Credits is a separate transaction.  Once a Crew Credit is redeemed, the consumer cannot reload that Crew Credit.  The consumer will simply replace that Crew Credit with a new one if the consumer purchases more Crew Credits.  For that same reason, each consumers' digital wallet of Crew Credits collectively constitute a "store gift card" because this digital wallet can be increased or reloaded.

75.     As to subdivision (iii) for both gift certificates and store cards, Crew Credits are "purchased on a prepaid basis in exchange for payment" given that a consumer will purchase Crew Credits with U.S. dollars before being able to pay for an in-game purchase, and this purchase occurs in exchange for payment (U.S. dollars).

76.     And as to subdivision (iv) for both gift certificates and store cards, Crew Credits are "honored upon presentation by such single merchant" because Ubisoft accepts Crew Credits from consumers for in-game purchases.

77.     Because Crew Credits meet the definitions under EFTA for "store gift card" and "gift certificate" and because Defendant caused Plaintiff Cerrato and Class Members' remaining, unredeemed Crew Credits to expire at the time the Game was shut down without proper notice as to the terms of expiration, Defendant has violated the EFTA.

78.     Similarly, Defendant's actions also violate Cal. Civ. Code § 1749.5, which states that "it is unlawful for any person or entity to sell a gift certificate to a purchaser that contains … [a]n expiration date."

79.     This California statute applies to "gift certificates" as described under Cal. Civ. Code § 1749.6 to "constitute[] value held in trust by the issuer of the gift certificate on behalf of the beneficiary of the gift certificate.  The value represented by the gift certificate belongs to the beneficiary, or to the legal representative of the beneficiary to the extent provided by law, and not to the issuer."

80.     Crew Credits are considered gift certificates under California law because Crew Credits are value that Ubisoft holds in trust on behalf of the consumers.  The value of any purchased Crew Credits belongs to that consumer, although it is held by Ubisoft for the consumer's benefit.

81.     Therefore, because the Crew Credits are considered gift certificates under California law and because Defendant expired any unredeemed Crew Credits when it shut the Game down, Defendant has also violated Cal. Civ. Code § 1749.5.

### CALIFORNIA DISCOVERY RULE

82.     Plaintiffs maintain the position that the present action is timely and not outside the statute of limitations for any of the asserted causes of action below, given that the harm did not occur until Defendant shut down the Game's servers on March 31, 2024.  However, to the extent the Court considers the cause of action to have existed prior to the Game's shutdown on March 31, 2024, Plaintiffs claims are preserved under California's discovery rules due to the following.

83.     Plaintiff Cassell did not discover the cause of action until a few weeks after March 31, 2024 when his family attempted to play the Game, but it was no longer available due to Defendant's shut down.  Plaintiff Cassell then searched for an answer on Google as to why the Game was not working and found out about Defendant shutting down the Game's servers.

84.     Plaintiff Liu discovered the cause of action after the Game's servers were shut down when he tried playing the Game and it would not connect to the server.

85.     Plaintiff Cerrato discovered the cause of action via internet news a few weeks after the Game's servers were shut down on March 31, 2024.

86.     Plaintiffs did not have the ability to make an earlier discovery despite reasonable diligence because although Ubisoft announced on December 14, 2023 that it would shut down the Game's servers on March 31, 2024, no actual cause of action existed until the Game was in fact shut down on March 31, 2024, since Plaintiffs and the Classes still had access to the Game and unexpired Crew Credits.

87.     Further, even if the harm occurred before the Game was shut down — which is not the case — Plaintiffs would have no reason to discover the cause of action before December 31, 2023, when Defendant first publicly announced it would shut the game down. A reasonable consumer exercising reasonable diligence would never know that Defendant would shut their games down before then because Defendant never affirmatively disclosed the true nature of the property rights it was conveying.

88.     Indeed, if a consumer exercised reasonable diligence, the only disclosure they would have discovered was that, on the inside of the Game's packaging, Defendant represented that the activation code on the inside of the Game's packaging did not expire until 1/1/2099.  *See* Figure 9.

**Figure 9**



89.     By affirmatively telling consumers they could activate the Game anytime during this *century*, Defendant implied that Game itself would remain playable during this time and long thereafter.

90.     Plaintiffs are not at fault for failing to discover the cause of actions sooner — again, because the cause of action did not accrue until the Game was shut down.

91.     Further, Plaintiffs did not have any presumptive knowledge of facts prior to the shut down of the Game that would put them on notice.  Even if Defendant told consumers it planned to shut down the Game prior to the announcement on December 14, 2023, the cause of action did not accrue at that point.

92.     Therefore, Plaintiffs' claims are timely.

## FED. R . CIV. P. 9(b) ALLEGATIONS

93.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

94.     **WHO**: Defendant omitted material facts from the packaging and marketing of the Product by omitting that it would shut down the Game's servers at any point without providing, at a minimum, an offline mode for consumers to continue to access the Game they paid for. Defendant also made material misrepresentations of fact to consumers by representing, through the totality of the Product packaging, that the Product was a video game and that consumers were purchasing a physical copy of the Game thereby giving them the full bundle of ownership rights over their copy of the Game.  However, this representation was false given that consumers, by paying for a physical disk of the Game, only obtained a license to use the Game, and the Game is no longer a video game since it no longer exists per Defendant's server shut down of *The Crew*.

95.     **WHAT**: Defendant's conduct was fraudulent and deceptive because it had the effect of deceiving consumers into believing that (1) by "buying" the Game, they were obtaining all the traditional bundle of sticks of property rights over the Game, when, in fact,  they were only receiving a limited license; (2) by purchasing a physical copy of the Game, a consumer would continue to have access to the Game without being subjected to Defendant barring their access to play the Game at any point; and (3) by paying for the Product, consumers were purchasing a video game, when in reality, they were only receiving access to enter a video game Defendant controlled entirely at their *noblesse oblige*.  Defendant omitted material facts from the packaging and marketing of the Product by omitting that it would shut down the Game's servers at any point

without providing, at a minimum, an offline mode for consumers to continue to access the Game they paid for. Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. In fact, Defendant's response to consumer complaints about the server shut down signals Defendant's knowledge of the materiality of this information. Yet, Defendant omitted these facts from the Products' labeling and marketing. Further, Defendant, as the developer, manufacturer, and distributor of the Game, had exclusive knowledge about the true state of its Game's operation, that the Game fully operated on Ubisoft servers, that consumers were not obtaining full ownership rights over the copy of the Game they purchased when paying for a physical disk, and that Defendant could and would shut down the servers and entirely disable the Game at any time.

96. **WHEN**: Defendant made the above-described omissions and misrepresentations continuously throughout the applicable relevant periods, including at the point of sale.

97. **WHERE**: Defendant's omissions and misrepresentations occurred in its marketing and advertising of the Game, meaning the Game's labels and packaging did not contain the pertinent information about Defendant's ability to shut down and completely disable the Game at any point. The Game was sold in both brick-and-mortar stores and online nationwide.

98. **HOW**: Defendant made these material omissions and misrepresentations on the labeling and marketing of the Game. And as discussed in detail throughout this Complaint, Plaintiffs and Class members viewed and relied on Defendant's omissions and misrepresentations before purchasing the Game.

99. **WHY**: Defendant omitted and misrepresented from the Game's labeling and marketing the fact that by paying for a physical copy of the Game, consumers were not obtaining the full bundle of ownership rights over that copy they purchased and that Defendant could completely destroy the Game at any point so that consumers would purchase the Product at a substantial price premium or more than they would have paid had they known the truth about the Product. As such, Defendant profited by selling the Product to thousands of consumers throughout the nation, including Plaintiffs and Class members.

## **CLASS ALLEGATIONS**

100.    Plaintiffs bring this class action pursuant to 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Game (the "Class").  Excluded from the Class are persons who made such purchases for purposes of resale.

101.    Plaintiffs also seek to represent a subclass of all Class Members who purchased the Game in the State of California (the "California Subclass").  Excluded from the California Subclass are persons who made such purchases for purpose of resale.

102.    Plaintiff Cerrato also seeks to represent a nationwide class of consumers who purchased the Game, purchased Crew Credits, and had unredeemed Crew Credits remaining at the time Defendant shut down the Game (the "Crew Credit Class").

103.    Lastly, Plaintiff Cerrato also seek to represent a subclass of all Class Members in California who purchased the Game, purchased Crew Credits, and had had unredeemed Crew Credits remaining at the time Defendant shut down the Game (the "California Crew Credit Subclass") (all classes collectively referred to as the "Classes").

104.    As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

105.    ***Numerosity***: Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, the Classes include thousands of consumers. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class Members may be notified of the pendency of this action by mail, email, and/or publication.

106.    ***Commonality and Predominance***: Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  These common legal and factual questions include, but are not limited to:

        (a)    whether Defendant's representations about the Product included false and/or misleading statements;

(b)     whether Defendant's omissions were material;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Classes;

(d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages;

107.    With respect to the California Subclasses, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as California's Unfair Competition Law.

108.    ***Typicality:*** Plaintiffs' claims are typical of the claims of the proposed Classes they seek to represent because Plaintiffs, like all members of the Classes, were induced by Defendant's false and misleading statements to purchase Defendant's Product and subsequently did purchase Defendant's Product during the relevant class periods without knowing that Defendant's claims and omissions about the Product were false and misleading. Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

109.    ***Adequacy:*** Plaintiffs are adequate representatives of the Classes they seek to represent because their interests do not conflict with the interests of the members of the Classes, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

110.    ***Superiority***: A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial

system presented by the complex legal and factual issues of this case. Individualized litigation also represents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

111.    Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

112.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and Members of the Classes, and Defendant will likely retain the benefits of wrongdoing.

113.    Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

## COUNT I
### (Violation of California's Consumers Legal Remedies Act ("CLRA"))
### California Civil Code § 1750, *et seq.*

114.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

115.    Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

116.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

117.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

118.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

119.    Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by omitting the material fact that (1) by purchasing a physical copy of the Game, a consumer would continue to

have access to the Game without being subjected to Defendant barring their access to play the Game at any point, and misrepresenting that (2) by paying for the physical copy of the Product, consumers were purchasing a limited license of the Game, not obtaining the full bundle of ownership rights over the copy of the Game they purchased.

120.    Defendant had exclusive knowledge of the true extent of consumers' ownership rights over the copy of the Game they purchased and of Defendant's ability and plans to shut down the Game's servers, in other words destroying the Game, which were not known to Plaintiffs or California Subclass Members at the time of purchasing.

121.    Plaintiffs and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid had they known the truth.

122.    On August 26, 2024, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complied in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

123.    Defendant failed to remedy the issues raised in the notice letter.  Accordingly, Plaintiffs seek damages from Defendant for its violations of the CLRA.

**COUNT II**
**(Violation of California's Unfair Competition Law)**
**Cal. Bus. & Prof. Code § 17200, *et seq.*,**
**(On Behalf of the California Subclass and California Crew Credits Subclass)**

124.    Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this Complaint.

125.    Plaintiffs bring this claim individually and on behalf of the Members of the California Subclass against Defendant.

126.    Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 – 17210, by engaging in unfair, fraudulent, and unlawful business practices.

127.    Plaintiffs have standing to pursue this claim because they suffered an injury-in-fact and lost money or property because of Defendant's unlawful, unfair, and fraudulent conduct.

128.    Specifically, Plaintiffs purchased the Product.  In doing so, Plaintiffs relied upon Defendant's false representations that when paying for a physical copy of the Game, they were paying in exchange for obtaining full ownership rights over that copy of the Game, when in reality, consumers were only obtaining a license to use the Game, subject to Defendant's will to keep the Game operational.  Further, consumers believed they were purchasing a video game, when in reality, this was false because Defendant shut down the Game's servers, thereby destroying the Game Plaintiffs paid money for.  Plaintiffs also relied on Defendant's omission of fact because Defendant did not disclose to Plaintiffs that it would shut down the Game's servers at any point without providing a mechanism for Plaintiffs, as purchasers and owners of the physical copies of the Game, to continue to have access to the Game.  Plaintiffs spent money in the transaction that they otherwise would not have spent had they known the truth about Defendant's advertising claims.  Alternatively, Plaintiffs would have paid substantially less for the Product had they known the truth.

**1.    *"Unfair" Prong of the UCL***

129.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  That unfairness is determined by weighing the reasons, justifications, and motives for the business act or practice against the gravity of the harm alleged.

130.    Defendant's conduct constitutes an "unfair" business practice because, as alleged herein, Defendant engaged in, false, misleading, and deceptive advertising campaigns that mislead consumers into believing that the Products they purchased were video games despite the fact that Defendant shut down the Game's servers, destroying the Game (meaning the Product is no longer a video game).  Further, Defendant engaged in, false, misleading, and deceptive advertising campaigns that mislead consumers given it did not disclose the material fact that although consumers paid money to purchase the Game at full price, Defendant would shut down the Game's servers, thereby destroying consumers' access to the Game altogether.

131.     Defendant's conduct, as alleged above and herein, was not motivated by any legitimate business or economic need or rationale, other than to maximize its revenue and the expense to consumers.  Specifically, upon information and belief, Defendant shut down the Game's servers so that consumers would purchase the next iterations of the Game, such as the *Crew 2* and *The Crew Motorfest*.  No legitimate reasons, justifications, or motives outweigh the harm and adverse impact of Defendant's conduct on members of the general consuming public.  Defendant engaged in such conduct solely to wrongfully extract monies from reasonable consumers seeking to own a video game, to which Defendant is not entitled.  Defendant could have, but has not, used alternative means of effecting its legitimate business needs, such as by, at a minimum, providing purchasing consumers of *The Crew* with a permanent avenue to access the Game, even if that avenue is a limited offline mode of the Game; or by simply explicitly and clearly informing consumers that when purchasing the Game, they were subject to Defendant shutting down the servers at any given point, without providing consumers with an offline patch of the Game.

132.     Defendant's conduct harms consumers and hurts market competition.  Defendant's conduct, as alleged herein, is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Members of the California Subclass because it violates consumers' reasonable expectations of what it means to pay for a physical copy of a video game.  If Defendant had advertised its Product in a non-misleading fashion, Plaintiffs and other California Subclass Members could have considered other options for purchasing video games, such as purchasing a video game that does not operate on servers.

### 2.     *"Fraudulent" Prong of the UCL*

133.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

Defendant has engaged in fraudulent business practices by knowingly representing to consumers that the Game they purchased was a video game, when in fact, this was false since Defendant destroyed the Game's servers, rendering the Product no longer a video game.  Also, Defendant has engaged in fraudulent business practices by omitting to inform consumers of the material fact that although consumers purchased a physical copy of the Game, Defendant would destroy the Game's

servers at any given point.  Defendant's conduct deceived Plaintiffs and California Subclass Members who purchased the Products in reliance on Defendant's misrepresentations and omissions and were likely to deceive members of the consuming public because, as alleged above, the Products violate consumers' reasonable expectations regarding their rights to preserve access to the Product once they purchased the physical copy of the Game.  Such a business practice lacks utility and functions only to maximize Defendant's profits at the expense of their customers.  The gravity of the harm to Plaintiffs and other California Subclass Members, who lost money or property by paying for the Products, far outweighs the benefit to Defendant's conduct.

### 3.    *"Unlawful" Prong of the UCL*

134.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

135.    Defendant's business practices as alleged herein constitute violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA").  Specifically, Defendant has unlawfully marketed and advertised their Products in violation of Cal. Civ. Code §§ 1770(a)(5), 1770(a)(7), and 1770(a)(9), as detailed below.

136.    Defendant's business practices also constitute violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et. seq.* (the "FAL"), as described below.

137.    Further, Defendant's acts also constitute a violation of the California Civil Code § 1749.5 and EFTA, 15 U.S.C. § 1693, *et. seq.* due to Defendant's expiring of consumers unredeemed Crew Credits at the time the Game was shut down.

138.    Defendant's unfair, fraudulent, and unlawful business practices, as enumerated and explained above and below, were the direct and proximate cause of financial injury to Plaintiffs and other members of the California Subclass.  Defendant has unjustly benefited as a result of its wrongful conduct.  Accordingly, Plaintiffs and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to: (a) provide restitution to Plaintiffs and the California Subclass; (b) disgorge all revenues obtained as a result of its violations of the UCL; (c); and pay attorneys' fees and costs for Plaintiffs and the California Subclass.

**COUNT III**
**(Violation of California's False Advertising Law)**
**Cal. Bus. & Prof. Code § 17500, *et seq.*,**
**(On Behalf of the California Subclass)**

139.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully stated herein.

140.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

141.    As set forth herein, Plaintiffs purchased the Products based on Defendant's labels and marketing which (1) represented to consumers that the Products they purchased were video games, when in fact, this was false since Defendant destroyed the Game's servers, rendering the Game no longer a video game; (2) represented to consumers that by buying a physical copy of the Game, consumers were obtaining the full bundle of ownership rights over the Game instead of merely a limited license to use the Game, and (2) omitted the material fact that although consumers purchased a physical copy of the Game at full price, Defendant could and later would destroy the Game's servers at any given point without providing consumers with any avenue to access the Game they paid for.

142.    Plaintiffs would not have purchased the Product at all or would have paid substantially less for it had they known the truth.

143.    Plaintiffs and the California Subclass paid money for the Products. However, they did not obtain the full value or any value of the Product due to Defendant's misrepresentations and omissions regarding the nature of the Product. Accordingly, Plaintiffs and the California Subclass members suffered an injury in fact and lost money or property as a direct result of Defendant's omissions and misrepresentations.

144.    Plaintiffs and members of the California Subclass are entitled to equitable relief and restitution in the amount they spent on the Products.

145.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, the damages resulting from their purchase of the Product are determined to be an amount less than the premium price of the Product. Without compensation for the full

premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

146.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred.

**COUNT IV**
**Electronic Funds Transfer Act ("EFTA")**
**15 U.S.C. §1693, *et seq.***
**(On Behalf of Plaintiff Cerrato and Crew Credit Class)**

147.    Plaintiff Cerrato incorporates by reference all of the foregoing paragraphs.

148.    The EFTA makes it "unlawful for any person to sell or issue a gift certificate, store gift card, or general-use prepaid card that is subject to an expiration date."  15 U.S.C. § 1693*l*-1(c)(1).

149.    The only exception to this prohibition is if the gift certificate, store gift card, or general-use prepaid card's "expiration date is not earlier than 5 years after the date on which [it] was issued … **and** … the terms of expiration are clearly and conspicuously stated."  *Id.* (emphasis added)

150.    As fully detailed above, Defendant's Crew Credits constitute both "gift certificates" and "store gift cards" under EFTA, 15 U.S.C. § 1693l-1(a)(2)(B)-(C).

151.    Defendant violated EFTA when it shut down the Game because many consumers, such as Plaintiff Cerrato, had remaining, unredeemed Crew Credits associated with their Game which they lost access to when Defendant shut down the Game.  In other words, Defendant caused the Crew Credits to expire.

152.    Although some consumers' Crew Credits may have expired after 5 years from the date they purchased the Crew Credits (or when Defendant issued the Crew Credits to them), since Defendant never provided consumers with a "clear and conspicuous" explanation of the terms of the expiration of the Crew Credits, Defendant's actions still constitute a violation of EFTA.

153.    Because of its unlawful acts and conduct, Defendant has deprived Plaintiff and all similarly situated consumers of the use of their Crew Credits and have collected through the sale of

Crew Credits with illegal expiration dates.  Plaintiff Cerrato and similarly situated consumers have been injured as a result of having one or more Crew Credits expire before they were redeemed.

154.    As authorized by 15 U.S.C. § 1693m, Plaintiff Cerrato, individually and on behalf of all similarly situated consumers nationwide, seeks actual and statutory damages to be determined by the Court, injunctive relief, the cost of this action, reasonable attorney's fees, and all other available relief.

**COUNT V**
**(Fraud)**
**On Behalf of the Classes**

155.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

156.    Plaintiffs bring this claim individually and on behalf of the Class and California Subclass (the "Classes")

157.    At the time Plaintiffs and Class Members purchased the Product, Defendant did not disclose, but instead misrepresented, that the Product was a video game, when in fact, it is not, given that Defendant shut down the Game's servers and destroyed the Game.  By providing physical version of the Game, Defendant also misrepresented that consumers were paying to obtain full ownership rights over the physical copy of the Game they purchased, instead of a limited license to use the Game.  Further, at the time Plaintiffs and Class Members purchased the Product, Defendant also omitted the fact that even though Plaintiffs and Class Members purchased the Product, that Defendant could and would shut down the Game's servers at any point without providing consumers with an avenue to access the Game they paid for.

158.    Defendant knew that its misrepresentations and omissions regarding the Product were material, and that a reasonable consumer would rely upon its representations and omissions in making purchasing decisions.

159.    Plaintiffs and Class Members did not know – nor could they have known through reasonable diligence – about the true nature of the Product.

160.    Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations and omissions in making their purchasing decisions.

161.    Plaintiffs and Class Members had a right to reply upon Defendant's representations and omissions as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

162.    Defendant, as the developer, publisher, and distributor of the Product, had exclusive knowledge of the Product's true qualities, including that (1) both the single and multiplayer options for the Game operated off the Ubisoft servers, (2) that in exchange for consumers' purchase, they were only providing consumers with a license to play the Game, versus ownership of the Game, and (3) that Defendant would and could shut down the Game's servers, rendering the Product inoperable, at any point.  As consumers, Plaintiffs and Class Members were not in the position to know these facts.

163.    Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's misrepresentations and omissions, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT VI**
**(Fraudulent Inducement)**
**On Behalf of the Classes**

164.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

165.    Plaintiffs bring this claim individually and on behalf of the Class and California Subclass.

166.    Defendant misrepresented the Product as discussed herein.

167.    Defendant knew, or should have known, that the Product was falsely portrayed and that knowledge of the true nature of the Product was withheld from the consumer public.

168.    Defendant also knew that its misrepresentations and omissions regarding the Product were material, and that a reasonable consumer would rely on Defendant's representations and omissions in making purchasing decision.

169.    Plaintiffs and Class Members did not know – nor could they have known through reasonable diligence – about the true quality of the Product.

170.    Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations and omissions in making their purchasing decisions.

171.     Plaintiffs and Class Members had a right to rely on Defendant's representations and omissions as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

172.     Defendant, as the developer, publisher, and distributor of the Product, had exclusive knowledge of the Product's true qualities, including that (1) both the single and multiplayer options for the Game operated off the Ubisoft servers, (2) that in exchange for consumers' purchase, it was only providing consumers with a license to play the Game, versus ownership of the Game, and (3) that Defendant would and could shut down the Game's servers, rendering the Product inoperable, at any point.  As consumers, Plaintiffs and Class Members were not in the position to know these facts.

173.     Defendant intended to induce – and did, indeed, induce – Plaintiffs and Class Members into purchasing the Product based upon its affirmative representations and omissions.

174.     Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's misrepresentations and omissions, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Misrepresentation)
### On Behalf of the Classes

175.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

176.     Plaintiffs bring this claim individually and on behalf of the Classes.

177.     Defendant falsely represented to Plaintiffs and the Classes that the Product was a video game, when viewing the Product packaging as a whole, when in reality, this representation was false given that Defendant shut down the Game's servers, rendering the Game completely destroyed (and no longer an existing video game).

178.     Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Classes to purchase the Product.

179.     Defendant knew or should have known that its representations about the Game were false in that the Game no longer exists.  Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as

Plaintiffs and the Class.

180. Defendant, as the developer, publisher, and distributor of the Game, had exclusive knowledge of the Product's true qualities, including that (1) both the single and multiplayer options for the Game operated off the Ubisoft servers, (2) that in exchange for consumers' purchase, it was only providing consumers with a license to play the Game, versus ownership of the Game, and (3) that Defendant would and could shut down the Game's servers, rendering the Product inoperable, at any point. As consumers, Plaintiffs and Class Members were not in the position to know these facts.

181. Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment. Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Product, Plaintiffs' and the Classes' reliance on Defendant's misrepresentations was justifiable.

182. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Classes have suffered actual damages in that they would not have purchased the Product at all had they known that the Product did not conform to Defendant's advertising and marketing.

183. Plaintiffs and the Classes seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

**COUNT VIII**
**Breach of Express Warranty**
**On Behalf of the Classes**

184. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

185. Plaintiffs bring this claim individually and on behalf of the Class and California Subclass.

186. Defendant, as the manufacturer, marketer, distributor, and/or seller of the Product, expressly warranted that Product was a video game, when viewing the Product packaging as a whole, when in reality, Defendant breached this express warranty given that Defendant shut down the Game's servers, rendering the Game completely destroyed. By providing a physical version of the Game, Defendant also expressly warranted that purchasers of the physical version were

obtaining ownership rights over the copy of the Game they purchased, when in fact, they were merely paying for a limited license to use the Game.

187.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Classes have been injured and harmed because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product would no longer be a video game.  Thus, Plaintiffs and members of the Classes overpaid for the Product because they no longer have the video game they paid for.

188.    On August 26, 2024, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607. The letter advised Defendant that it breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

189.    As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continue to suffer financial damage, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

**COUNT IX**
**Breach of Implied Warranty**
**On Behalf of the Classes**

190.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

191.    Plaintiffs bring this claim individually and on behalf of the Class and California Subclass.

192.    Defendant, as the manufacturer, marketer, distributor, and/or seller of the Product, impliedly warranted that the Game was a video game, when viewing the Product packaging as a whole, when in reality, Defendant breached this implied warranty given that Defendant shut down the Game's servers, rendering the Game completely destroyed (and no longer an existing video game).  Further, by providing a physical version of the Game, Defendant also impliedly warranted that purchasers of the physical version were obtaining ownership rights over the copy of the Game they purchased, when in fact, they were merely paying for a limited license to use the Game.

193.    As a direct and proximate cause of Defendant's breach of implied warranty, Plaintiffs and members of the Classes have been injured and harmed because they would not have purchased the Product, or would have paid substantially less for it, if they had known that the Product would no longer be a video game.  Thus, Plaintiffs and members of the Classes overpaid for the Product because the Product no longer exists.

194.    On August 26, 2024, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607. The letter advised Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

195.    As a result of Defendant's breach of implied warranty, Plaintiffs and each Class Member suffered and continue to suffer financial damage, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Class and the California Subclass and Plaintiffs' attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs, the Class, and the California Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For an order awarding Plaintiffs and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: March 18, 2025                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    _/s/ Neal J. Deckant_____

Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
         sbogdanovich@bursor.com
         idiaz@bursor.com

*Attorneys for Plaintiffs and the Putative Classes*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Neal J. Deckant, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs Alan Liu, Mathew Cassell, and Angel Cerrato, who allege they reside in Madera, California, West Sacramento, California, and El Paso de Robles, California respectively.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California.  Additionally, Defendant transacts substantial business in this District, including purchases of the Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiffs in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 18th day of March, 2024.

*/s/ Neal J. Deckant*
Neal J. Deckant