**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
         sbogdanovich@bursor.com
         idiaz@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW CASSELL, ALAN LIU, and ANGEL CERRATO, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UBISOFT, INC., <br><br> Defendant. | Case No. 2:24-cv-03058-DAD-CSK <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> Date: July 21, 2025 <br> Time: 1:30 p.m. <br> Courtroom: 4, 15th Floor <br> Judge: Dale A. Drozd |

1

**TABLE OF CONTENTS**

2
                                                                                                    **PAGE(S)**

3    INTRODUCTION ............................................................................................................1

     ARGUMENT ...................................................................................................................5
4
     I.      PLAINTIFFS ALLEGE BOTH ARTICLE III AND STATUTORY
5            STANDING.....................................................................................................5

6            A.     Plaintiffs Have Alleged Article III Standing ..........................................6

             B.     Plaintiffs Have Alleged Statutory Standing Under The CLRA, UCL,
7                   And FAL...................................................................................................8

8    II.     DEFENDANT'S TIMELINESS ARGUMENTS FAIL ................................10

9            A.     Defendant's Timeliness Arguments Are Inappropriate At This Stage....10

             B.     Plaintiffs Sufficiently Allege The Delayed Discovery Rule Applies
10                  To Their False Advertising-Based Claims .............................................12

11           C.     Plaintiff Cerrato's EFTA Claims Are Not Time-Barred .........................15

             D.     Plaintiff Cerrato Sufficiently Alleges The Delayed Discovery Rule
12                  Applies To His EFTA Claim...................................................................15

13   III.    PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS UNDER THE CLRA,
             FAL, AND UCL ...........................................................................................16
14
             A.     Plaintiffs Plausibly Allege Defendant Made Affirmative
15                  Representations.......................................................................................18

             B.     Plaintiffs Plausibly Allege Reasonable Consumers Would Rely On
16                  Defendant's Representations And Omissions .........................................21

17   IV.     PLAINTIFFS PLAUSIBLY ALLEGE FRAUD CLAIMS............................26

18   V.      PLAINTIFF CERRATO PLAUSIBLY ALLEGES A VIOLATION OF
             EFTA AND CAL. CIV. CODE § 1749.5......................................................27
19
     VI.     PLAINTIFFS PLAUSIBLY ALLEGE A BREACH OF EXPRESS AND
20           IMPLIED WARRANTY.................................................................................29

     CONCLUSION .............................................................................................................30
21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

**CASES**

4

*24/7 Customer, Inc. v. 24-7 Intouch,*
  2015 WL 1522236 (N.D. Cal. Mar. 31, 2015) ............................................................... 11

*Ajzenman v. Off. of Comm'r of Baseball,*
  492 F. Supp. 3d 1067 (C.D. Cal. 2020) ....................................................................... 14

*Andino v. Apple, Inc.,*
  2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) ..................................................... passim

*Bazarganfard v. Club 360 LLC,*
  2023 WL 2376290 (C.D. Cal. Jan. 24, 2023) .................................................................. 6

*Becerra v. Dr Pepper/Seven Up, Inc.,*
  945 F.3d 1225 (9th Cir. 2019) ..................................................................................... 25

*Caldwell v. Nordic Nats., Inc.,*
  709 F. Supp. 3d 889 (N.D. Cal. 2024) ......................................................................... 23

*Castillo v. Prime Hydration LLC,*
  2024 WL 4133815 (N.D. Cal. Sept. 9, 2024) .............................................................. 25

*Chabolla v. ClassPass Inc.,*
  129 F.4th 1147 (9th Cir. 2025) .................................................................................... 14

*Cody v. SoulCycle Inc.,*
  2016 WL 4771392 (C.D. Cal. Jan. 11, 2016) ............................................... 5, 6, 27, 28

*Cortes v. Univ. & State Emps. Credit Union,*
  2023 WL 12009972 (S.D. Cal. Mar. 13, 2023) ........................................................... 15

*Cullen v. Netflix, Inc.,*
  2013 WL 140103 (N.D. Cal. Jan. 10, 2013)................................................................. 23

*Disney Enters., Inc. v. Redbox Automated Retail, LLC,*
  336 F. Supp. 3d 1146 (C.D. Cal. 2018)....................................................................... 24

*E–Fab, Inc. v. Accounts., Inc. Servs.,*
  153 Cal. App. 4th 1308 (2007)..................................................................................... 12

*Farley v. GameStop Corp.,*
  2013 WL 4042434 (D.N.J. Aug. 7, 2013).................................................................... 20

*Flores v. Gain Cap. Grp., LLC,*
  2018 WL 6133644 (C.D. Cal. June 20, 2018).............................................................. 26

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Freeman v. Wal-Mart Stores, Inc.*,
    111 Cal. App. 4th 660 (2003) .................................................................... 28, 29

*Garcia v. Sony Comput. Ent. Am., LLC*,
    859 F. Supp. 2d 1056 (N.D. Cal. 2012) ...................................................... 19, 20

*Glaski v. Bank of Am., N.A.*,
    218 Cal. App. 4th 1079 (2013) ........................................................................ 9

*Gomez v. JP Morgan Chase Bank, N.A.*,
    2024 WL 2243243 (S.D. Cal. Mar. 26, 2024) ............................................... 5, 16

*Goodwin v. Walgreens, Co.*,
    2023 WL 4037175 (C.D. Cal. June 14, 2023) ................................................. 29

*Hadley v. Kellogg Sales Co.*,
    273 F. Supp. 3d 1052 (N.D. Cal. 2017) ...................................................... 29, 30

*Hamman v. Cava Group, Inc.*,
    2023 WL 3450654 (S.D. Cal. Feb. 8, 2023) .................................................... 8

*Harris v. McDonald's Corp.*,
    2021 WL 2172833 (N.D. Cal. Mar. 24, 2021) ................................................ 23

*Harvey v. Google Inc.*,
    2015 WL 9268125 (N.D. Cal. Dec. 21, 2015) ................................................ 15

*Hines v. Wells Fargo Home Mortg., Inc.*,
    2015 WL 351818 (E.D. Cal. Jan. 26, 2015) ................................................... 11

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013) ....................................................................... 6

*Hodsdon v. Mars, Inc.*,
    162 F. Supp. 3d 1016 (N.D. Cal. 2016) .......................................................... 5

*In re Amazon Prime Video Litig.*,
    2024 WL 1138906 (W.D. Wash. Mar. 15, 2024) ..................................... passim

*Jablon v. Dean Witter & Co.*,
    614 F.2d 677 (9th Cir. 1980) ........................................................................ 11

*Jama v. State Farm Mut. Auto. Ins. Co.*,
    113 F.4th 924 (9th Cir. 2024) ........................................................................ 6

*James v. Chocmod USA Inc.*,
    2025 WL 950509 (E.D. Cal. Mar. 28, 2025) .................................................. 29

*Johnson v. Mitsubishi Digital Elecs. Am. Inc.*,
  365 F. App'x 830 (9th Cir. 2010) ............................................................................................. 8

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................................. 11

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ..................................................................................................... 8, 10

*La Barbera v. Ole Mexican Foods Inc.*,
  2023 WL 4162348 (C.D. Cal. May 18, 2023) ...................................................................... 24

*Lawrence v. Finicity Corp.*,
  716 F. Supp. 3d 851 (E.D. Cal. 2024) .......................................................................... 10, 11

*Leong v. Square Enix of Am. Hldgs., Inc.*,
  2010 WL 11519184 (C.D. Cal. Jan. 20, 2010) ..................................................................... 10

*Leong v. Square Enix of Am. Holdings, Inc.*,
  2010 WL 1641364 (C.D. Cal. Apr. 20, 2010) ........................................................... 4, 13, 19

*Lytle v. Nutramax Lab'ys, Inc.*,
  114 F.4th 1011 (9th Cir. 2024) .............................................................................................. 10

*Mai v. Supercell Oy*,
  648 F. Supp. 3d 1130 (N.D. Cal. 2023) .................................................................................. 8

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ................................................................................................. 6

*McGhee v. N. Am. Bancard, LLC*,
  2017 WL 3118799 (S.D. Cal. July 21, 2017) ....................................................................... 14

*McKay v. Sazerac Company, Inc.*,
  2023 WL 3549515 (N.D. Cal. May 17, 2023) ................................................................. passim

*McKee v. Audible, Inc.*,
  2017 WL 7388530 (C.D. Cal. Oct. 26, 2017) ................................................................... 5, 28

*McMahon v. Take-Two Interactive Software, Inc.*,
  2017 WL 11681048 (C.D. Cal. Apr. 19, 2017) .................................................................... 25

*McTyere v. Apple, Inc.*,
  663 F. Supp. 3d 247 (W.D.N.Y. 2023) ............................................................................ passim

*Mendoza v. Procter & Gamble Co.*,
  707 F. Supp. 3d 932 (C.D. Cal. 2023) .................................................................................. 29

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) ....................................................................................... 8, 9, 10

*Moore v. Trader Joe's Co.*,
  4 F.4th 874 (9th Cir. 2021)............................................................................................. 23

*Morgan v. Harmonix Music Sys., Inc.*,
  2009 WL 2031765 (N.D. Cal. July 7, 2009) ................................................................. 20

*New York City Employees' Ret. Sys. v. Berry*,
  667 F. Supp. 2d 1121 (N.D. Cal. 2009).......................................................................... 26

*Pac. Bell Tel. Co. v. Linkline Comms., Inc.*,
  555 U.S. 438 (2009) .......................................................................................................... 9

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
  514 F.3d 856 (9th Cir. 2007) ............................................................................................ 9

*Panelli v. Target Corp.*,
  No. 24-CV-01218, 2024 WL 4596412 (S.D. Cal. Oct. 28, 2024)................................. 25

*Park v. Webloyalty.com, Inc.*,
  2014 WL 4829465 (S.D. Cal. Sept. 29, 2014) .............................................................. 15

*Patterson v. Wells Fargo & Co.*,
  2024 WL 5339479, n.1 (N.D. Cal. May 30, 2024)...................................................... 5, 15

*Philips v. Ford Motor Co.*,
  2015 WL 4111448 (N.D. Cal. July 7, 2015) ................................................................. 12

*Ramirez v. Trusper, Inc.*,
  2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) .............................................................. 14

*Rothman v. Equinox Holdings, Inc.*,
  2021 WL 124682 (C.D. Cal. Jan. 13, 2021).................................................................... 5

*Schuck v. Fed. Nat'l Mortg. Ass'n*,
  2011 WL 2580552 (E.D. Cal. June 28, 2011) ................................................................ 9

*Taylor v. Apple, Inc.*,
  2021 WL 11559513 (N.D. Cal. Mar. 19, 2021) .............................................................. 8

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..................................................................................................... 5

*Watson v. Crumbl LLC*,
  736 F. Supp. 3d 827 (E.D. Cal. 2024) ............................................................................ 4

*Whiteside v. Kimberly Clark Corp.*,
  108 F.4th 771 (9th Cir. 2024)........................................................................................ 23

*Widjaja v. JPMorgan Chase Bank, N.A.*,
  2019 WL 8108716 (C.D. Cal. Nov. 19, 2019) .............................................................. 16

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008) ................................................................ passim

*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019) ........................................................ 3, 4, 13, 14

**STATUTES**

15 U.S.C. § 1693m(g) ........................................................................... 15

Cal. Civ. Code § 1749.5 ................................................................ passim

## INTRODUCTION[1]

Contrary to Ubisoft's assertions, Plaintiffs are not the ones "adopt[ing] a kitchen sink approach" to their pleadings. ECF No. 19 (Defendant's Second Motion to Dismiss) (the "MTD"). Ubisoft is. Ubisoft's motion to dismiss attacks strawman theories of injury that Plaintiffs do not raise, ignores key factual allegations, over-sells certain case holdings, and stretches statutory text beyond its intended scope.

After selling consumers hard copies of its video game *The Crew*, Ubisoft decided after ten years to render the game inoperable—presumably to coerce consumers to buy spin-off games like *The Crew 2* or *The Crew Motorfest*. First Amended Complaint ("FAC") ¶¶ 2-3. Making matters worse, Ubisoft even encouraged players to buy its virtual currency (Crew Credits) to unlock bonus features of the game, only to later "brick"[2] the game. This locked players out of using the digital currency they paid for—essentially voiding this digital currency—without compensation or recourse. *Id.* ¶ 6. Yet, Ubisoft argues that Plaintiffs have no injury and no case. Taken to its logical conclusion, Ubisoft would seem to contend that even electronic vehicle purchasers whose cars suddenly became inoperable because the manufacturer blocked access to all charging stations, or that smartphone purchasers whose phones all suddenly became inoperable because the manufacturer blocked the phones from having internet access or cellular networks ***would also never have a claim***. Make no mistake, in today's brave new world, Ubisoft is trying to strip all electronic device purchasers of their property rights.

Ubisoft's argument that Plaintiffs have no injury and lack standing because they "received the benefit of their bargain" is not well taken. It is perfectly reasonable for consumers who bought a physical video game disk—or even a downloadable version of the game—to believe they owned that game. In fact, other courts have held that consumers who "bought" digital movies on Amazon Prime or the iTunes Store plausibly alleged injury when they lost the rights to watch their movies.

---

[1] Plaintiffs note their opposition to Defendant's motion to dismiss is 30 pages given the Court's grant of the Parties' stipulation requesting the briefing be 30 pages. ECF No. 17 (Court setting the page limit to the opposition at 30 pages).

[2] In modern-day parlance, to "brick" means "[t]o render your computer [or other electronic device] useless, as useless as a brick." Urban Dictionary, *Bricked*, available at https://www.urbandictionary.com/define.php?term=bricked (last accessed, May 22, 2025).

*Andino v. Apple, Inc.*, 2021 WL 1549667, at \*3-4 (E.D. Cal. Apr. 20, 2021); *In re Amazon Prime Video Litig.*, 2024 WL 1138906, at \*3 (W.D. Wash. Mar. 15, 2024) ("*In re Amazon*"); *see also McTyere v. Apple, Inc.*, 663 F. Supp. 3d 247, 254 (W.D.N.Y. 2023). After all, reasonable consumers would not "expect Amazon to return to their homes to repossess items after delivery." *In re Amazon*, 2024 WL 1138906, at \*3. As one court colorfully put it: "Suppose, for example, a consumer 'bought' Barbie and Oppenheimer for \$19.99 each from Amazon, anticipating having a 'Barbenheimer' weekend event. But after watching Barbie, she finds Oppenheimer now unavailable because Amazon suddenly lost its license to the film. Not sublime! Understandably, this consumer 'might feel a little miffed or go nuclear if she were told that she received exactly what she paid for.'" *In re Amazon*, 2024 WL 1138906, at \*3 (citing *McTyere*, 663 F. Supp. 3d at 254) (internal brackets omitted). The exact same is true here.

Ignoring all these cases, Ubisoft claims "no reasonable consumer would believe that they owned and could access *The Crew* in perpetuity." MTD at 22. But another court in this District rejected the very same argument when "Apple contend[ed] that '[n]o reasonable consumer would believe' that purchased content would remain on the iTunes platform indefinitely." *Andino*, 2021 WL 1549667, at \*4. The *Andino v. Apple, Inc.* court did not agree, noting it plausible for "reasonable consumers [to] expect [that] 'buying' the content means access cannot be revoked." *Id.* at \*3. As did another court that held "reasonable consumers might have believed that their purchasing digital content from the iTunes Store gave them the ability to use that digital content indefinitely—not merely the right to use it for some limited time." *McTyere*, 663 F. Supp. 3d at 255. That argument did not work then and should not work now.

Ubisoft also claims it made no affirmative misrepresentations. That is not true. A product's packaging can itself be misleading if it makes consumers believe the thing purchased is different than what it is. For example, in *McKay v. Sazerac Company, Inc.*, 2023 WL 3549515, \*6-7 (N.D. Cal. May 17, 2023), a California court held reasonable consumers could plausibly be misled by a "1.7-oz, shot-size bottle common for hard liquor" with logo "Fireball," into thinking they were buying whisky, when in fact, they were only receiving malt liquor with half the alcohol content. And even beyond that, *The Crew*'s packaging *repeatedly* references, in all caps, that certain "*online*

1    *features*" and "*online portions*" of the game may be discontinued, which misleads consumers into

2    believing that the offline "1 PLAYER" version of the game would not. FAC ¶ 58. After all, one

3    can still play the original Super Mario Bros. from 1985 on the Nintendo Entertainment System just

4    fine—another "1 player" game released forty years ago. Nobody would expect Nintendo to

5    randomly show up at their home to take their single-player games away.

6        Ubisoft also claims gamers should have known their access to games could be revoked

7    because they were disclosed in the Terms. Not so. Another court rejected Apple's very same

8    argument when it claimed the "iTunes Store terms and conditions alerted the plaintiffs (and other

9    consumers) to the possibility that they might lose access to purchased digital content." *McTyere*,

10   663 F. Supp. 3d at 255. The reason: "knowledge of the terms and conditions cannot be attributed to

11   the plaintiffs because of the terms and conditions *inconspicuous placement*." *Id*. at 256 (internal

12   brackets and quotation marks omitted). Simply put, courts "disagree … that reasonable consumers

13   should be expected to look beyond misleading representations on the front of the box to discover

14   the truth from … small print on the side of the box." *Williams v. Gerber Prods. Co.*, 552 F.3d 934,

15   939 (9th Cir. 2008).

16       Worse still, Ubisoft's Terms here aren't even on the box *at all*. They are lurking somewhere

17   on one of various webpages of Ubisoft's website. On the Xbox packaging, there is no reference to

18   any Terms at all. *See* FAC, Fig. 6. And on the PlayStation packaging, in fine print, it says

19   "Software subject to license (see terms at ubi.com)." *Id*., Fig. 7. In other words, just to find the

20   Terms the consumer needs to (1) go to a computer, (2) type the URL into a web browser, (3)

21   navigate the Ubisoft website's main page, and (4) click through various links just to find the terms

22   they are supposedly agreeing to all before they even reach a GameStop checkout counter. This puts

23   consumers through what the Ninth Circuit calls "a hide-the-ball exercise." *Wilson v. Huuuge, Inc.*,

24   944 F.3d 1212, 1221 (9th Cir. 2019). The Ninth Circuit in *Wilson v. Huuuge, Inc*. already warned

25   video game publishers like Ubisoft that providing gamers with a URL of its website, while

26   "fail[ing] to hyperlink the Terms [or otherwise make them readily available] … is the equivalent to

27   admonishing a child to 'please eat your peas' only to then hide the peas." 944 F.3d at 1221. And

28   so, the Court refused to enforce a video game publisher's terms where the publisher simply gave

gamers a URL and required them to go "complete a multiple-step process of clicking non-obvious links" just to find the terms. *Id*. As have numerous other courts. *See infra*. So, while we live in a brave new world of high technology, the traditional notions of contract formation and assent still apply.

So while Ubisoft argues that no reasonable consumer could be misled by these statements—because of its own subjective understanding of what its packaging implies and what its hidden Terms say, *see* MTD at 19—"[c]ourts rarely grant a motion to dismiss for failure to satisfy this test in the initial pleadings, '[b]ecause what a reasonable person would believe is generally a question of fact,' and at this stage, the court's focus is on the plausibility of the legal theories." *Watson v. Crumbl LLC*, 736 F. Supp. 3d 827, 841 (E.D. Cal. 2024). And again, "It seems plausible … that reasonable consumers would expect their access couldn't be revoked." *Andino*, 2021 WL 1549667, at *4.

Against the weight of all this authority, Ubisoft quotes various legal propositions out of context. But none of its cited cases come remotely close to supporting its position. Indeed, the best case it relies on throughout its brief—*Leong v. Square Enix of Am. Holdings, Inc*., 2010 WL 1641364 (C.D. Cal. Apr. 20, 2010) ("*Leong II*")—illustrates the point. *Leong II* did not even involve a video publisher shutting down a game's server. Instead, it involved consumers of a *subscription-based game* that had to "*pay a monthly subscription fee*" to play the game that then became upset they lost their account after they stopped their *subscription*. *Id*. at *1. *The Crew* is not a *subscription* game. Plaintiffs made a *one-time purchase* of a physical game disk they reasonably believed they owned outright.

Ubisoft also argues that the statute of limitations for various claims have expired because it waited ten years to destroy the game. However, the delayed discovery rule applies to Plaintiffs' claims. Ubisoft kept consumers in the dark about their property rights and only announced its intention to entirely "shut down the Game's servers" in December of last year. *See* FAC ¶¶ 86-87. Worse still, Ubisoft's blanket claim that: "California federal courts have *concluded* that 'the discovery rule does not apply to the EFTA,'" MTD at 11 (emphasis added), is untrue. Just last year, a California federal court held that "Defendant's assertion that the statute of limitations for

1  Patterson and Adams' EFTA claims has expired lacks merit .... Both Adams and Jordan filed suit

2  within one *year of discovering the transaction*s, and included sufficient factual allegations

3  regarding their inability to discover the transactions earlier based on complete unawareness of the

4  accounts *to support application of the discovery rule*." *Patterson v. Wells Fargo & Co.*, 2024 WL

5  5339479, at *3, n.1 (N.D. Cal. May 30, 2024) (emphasis added). Indeed, even Ubisoft's own cited

6  cases caution that: "The Ninth Circuit has not decided whether the discovery rule applies to EFTA

7  violations." *Gomez v. JP Morgan Chase Bank, N.A.*, 2024 WL 2243243, at *5 (S.D. Cal. Mar. 26,

8  2024).

9      The remainder of Ubisoft's arguments against Plaintiffs' EFTA and California Civil Code §

10  1749.5 claims for expiring Crew Credits are scattershot and devoid of any analysis. *See* MTD at

11  26-27. Numerous courts have held that electronic crediting systems just like Crew Credits qualify

12  as gift certificates under EFTA and its California law analogue. *See Cody v. SoulCycle Inc.*, 2016

13  WL 4771392, at *9 (C.D. Cal. Jan. 11, 2016); *McKee v. Audible, Inc.*, 2017 WL 7388530, at *19

14  (C.D. Cal. Oct. 26, 2017); *Rothman v. Equinox Holdings, Inc.*, 2021 WL 124682, at *6-7 (C.D.

15  Cal. Jan. 13, 2021).

16      In short, while Ubisoft's brief reads confidently, a review of the case law reveals many of

17  its arguments are either legally unsupported or based on a strained reading of relevant case law.

18  Above all, this Court should uphold traditional notions of contract and warranty law.

19                          **ARGUMENT**

20  **I.    PLAINTIFFS ALLEGE BOTH ARTICLE III AND STATUTORY STANDING**

21      A plaintiff adequately pleads Article III standing when they allege "(i) that he [or she]

22  suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury

23  was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial

24  relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Further, a plaintiff has statutory

25  standing under California's consumer protection statutes when alleging that they relied on the

26  deceptive advertisement and lost money as a result. *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016,

27  1021-22 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018). Here, Plaintiffs adequately plead

28  both Article III and statutory standing.

### A. Plaintiffs Have Alleged Article III Standing

Defendant argues Plaintiffs have failed to "plausibly allege[] injury, as required to establish Article III standing, because their access to *The Crew* and any Crew Credits was entirely consistent with what was marketed to them on *The Crew*'s packaging and in Ubisoft's Terms." MTD at 15. Not so. Plaintiffs allege that "[h]ad [they] known of Defendant's omitted material facts and misrepresentations, they would not have purchased the Game or would have paid less for it." FAC ¶ 63; *see also id.* ¶¶ 4, 11, 13, 15, 128; *id.* ¶ 14-15 (applicable to Plaintiff Cerrato's expiring Crew Credits allegations). Simply put, "Plaintiffs have alleged an injury in fact, *i.e.*, they overpaid for a purchase they otherwise would not have paid for because they did not get the full value of their purchase, owning outright vs. purchasing a limited license." *In re Amazon*, 2024 WL 1138906, at *3; *accord Andino*, 2021 WL 1549667, at *2 ("Rather the injury Plaintiff asserts, is that he spent money purchasing the content that he wouldn't have otherwise as a result of Apple's misrepresentation"). Indeed, "spen[ding] money that, absent defendants' actions, they would not have spent" is a "quintessential injury-in-fact." *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011). Nothing more is required.

What is more, Plaintiff Cerrato's expiring Crew Credits claims also allege injury separate and apart from the overpayment. The Credits are gone. "[T]he injury here—a lighter wallet—has long been 'traditionally recognized as providing a basis for a lawsuit in American courts.'" *Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924, 937–38 (9th Cir. 2024). Indeed, courts have held violations of statutory rights under EFTA *per se* confer standing. *Bazarganfard v. Club 360 LLC*, 2023 WL 2376290, at *8 (C.D. Cal. Jan. 24, 2023); *Cody*, 2016 WL 4771392, at *6; *accord* FAC ¶¶ 14, 64-77, 147-154 (alleging statutory violations of EFTA).

Defendant counters that Plaintiffs lack standing because they received the benefit of their bargain. MTD at 15-16. This is nonsense. The "benefit of the bargain defense is permissible ***only if*** the misrepresentation that the consumer alleges ***was not material***." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013), *as amended* (July 8, 2013) (internal citations omitted) (emphasis added). In other words, it is only permissible for a defendant to say consumers received the benefit of the bargain when the misrepresentation was about a little thing, not a big thing.

1    The difference between owning something and having a license to use it is indeed a big

2    thing. And Plaintiffs allege Ubisoft's misrepresentations about the game *were* "material given that

3    consumers value a good that they own more than a good that they license. Knowing that the Game

4    could be shut down at any point is a material consideration that would influence consumers'

5    decision about whether to pay the full price for the Game, or whether to even buy it to begin with."

6    FAC ¶ 56; *see also id.* ¶¶ 11, 15, 44. Indeed, many courts have held the distinction between owning

7    versus receiving a limited license is "material[] … to the reasonable consumer … Understandably,

8    this consumer 'might feel a little miffed [or go nuclear] if she were told that she received exactly

9    what she paid for.'" *In re Amazon*, 2024 WL 1138906, at *3 (*citing McTyere*, 663 F. Supp. 3d at

10   254) (internal brackets omitted)

11   Ubisoft brushes aside Plaintiffs' allegations about materiality. Instead, it selectively quotes

12   three words out of context on the game's packaging to argue consumers knew what they were

13   getting. *See* MTD at 15 ("The packaging contains clear notices that Ubisoft could 'CANCEL

14   ACCESS' to aspects of the game that were 'REQUIRED' to play.") Ubisoft's selective quoting is

15   highly misleading—if not outright false.

16   The packaging actually reads: "*INTERNET* ACCESS AND VALID UPLAY ACCOUNT

17   ARE REQUIRED *TO ACCESS THE ONLINE FEATURES, PLAY ONLINE, OR UNLOCK*

18
19   

20   *EXCLUSIVE CONTENT…* UBISOFT MAY *CANCEL ACCESS TO* ONE OR MORE *SPECIFIC*

21   *ONLINE FEATURES.*" *See* FAC Fig. 6, (reproduced below) (emphases added).

22   These disclosures are hedged to only cover "*specific online features*" and say nothing about

23   revoking *offline features, i.e., the ability to play the game at all*. And as the FAC alleges, the

24   packaging "misleads consumers into believing that there is an offline portion of the Game because

25   it warns that 'SCEA may retire the online portion of this game at any time'" and "includes

26   references to '1 PLAYER' functionality." FAC ¶ 58. In any event, Ubisoft's strained and self-

27   serving interpretations of what its own packaging says are inappropriately raised at this juncture.

28

1    "How reasonable consumers would interpret Defendant's representations in its marketing is

2    question of fact, and not a question that the court can resolve at [the motion to dismiss] stage."

3    *Hamman v. Cava Group, Inc.*, 2023 WL 3450654, at *11 (S.D. Cal. Feb. 8, 2023).

4            None of the cases Defendants rely on apply because none involve a Defendant revoking

5    access to something consumers reasonably believed they owned. *Mai v. Supercell Oy*, 648 F. Supp.

6    3d 1130, 1134 (N.D. Cal. 2023) and *Taylor v. Apple, Inc.*, 2021 WL 11559513, at *4 (N.D. Cal.

7    Mar. 19, 2021) both concerned "loot boxes" where gamers paid to receive random virtual items.

8    Plaintiffs here were not spinning a wheel of fortune or opening some loot box to receive a random

9    item; they were opening *The Crew* box and were expecting to own *The Crew*. And in *Johnson v.*

10   *Mitsubishi Digital Elecs. Am. Inc.*, 365 F. App'x 830, 832-83 (9th Cir. 2010) a plaintiff complained

11   his TV's HDMI port "could not accept a native 1080p signal," even though this capability was ***not***

12   "relevant to Plaintiff when he purchased his television." Here, in contrast, Plaintiffs do allege that

13   there is a "material" difference between owning something and receiving a revocable license to use

14   it. FAC ¶ 56; *see also id.* ¶¶ 11, 15, 44.

15          **B.    Plaintiffs Have Alleged Statutory Standing Under The CLRA,**
            **UCL, And FAL**

16

17                 ***i.    Plaintiffs sufficiently plead actual reliance***

18          Defendant next argues that Plaintiffs lack statutory standing under the CLRA, UCL, and

19   FAL because their allegations of reliance are "conclusory" and the "mere assertion of reliance is

20   insufficient at the motion to dismiss stage." MTD at 15 (internal citations omitted). Defendant is

21   wrong. "[A] plaintiff is *not* required to allege that the challenged misrepresentations [or omissions]

22   were the *sole* or even the *decisive* cause of the injury-producing conduct." *Moore v. Mars Petcare*

23   *US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020) (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th

24   310, 327 (2011)) (emphasis in original). Instead, "[t]o allege reliance, a plaintiff 'only need[ ]

25   establish it to be plausible that a 'reasonable man would attach importance to [the] existence or

26   nonexistence [of the misrepresentation] in determining his choice of action in the transaction in

27   question.'" *Id*. at 1021. And this can be inferred "from the misrepresentation of a material fact." *Id*.

28

As *Moore* illustrates, this is a low hurdle. There, plaintiffs "collectively allege[d] that '[a]s a result of the false and fraudulent prescription requirement, each Plaintiff paid more for Prescription Pet Food than each Plaintiff would have paid in the absence of the requirement, or would never have purchased Prescription Pet Food.' This is sufficient." *Id*. at 1020. Likewise, in *Andino*, the plaintiff met the reliance requirement by alleging "[h]ad Plaintiff and Class members known the truth, they would not have <u>bought</u> the Digital Content from Defendant or would have paid substantially less for it." 2021 WL 1549667, at *3 (emphasis added by court). Plaintiffs here make the very same allegation: "Had [they] known of Defendant's omitted material facts and misrepresentations, they would not have purchased the Game or would have paid less for it." FAC ¶ 63; *see also id*. ¶¶ 4, 11, 13, 15, 128. No further details are needed. *See Moore*, 966 F.3d at 1020-21.

Defendant's citation to two fraud cases, *Schuck v. Fed. Nat'l Mortg. Ass'n*, 2011 WL 2580552, at *5 (E.D. Cal. June 28, 2011) and *Glaski v. Bank of Am., N.A.*, 218 Cal. App. 4th 1079, 1091 (2013) (MTD at 15), are unrelated to the CLRA, UCL, or FAL, and therefore unavailing given the Ninth Circuit's ruling on what is required to plead actual reliance in a case like Plaintiffs'.

### ii. The Court should assess reliance based on Plaintiff Liu's FAC allegations

Defendant argues there is "no doubt that Plaintiff Liu has pled himself out of court on the actual reliance element" by referencing the allegations in the first filed Complaint. MTD at 13-14. But "an amended complaint supersedes the original complaint." *Pac. Bell Tel. Co. v. Linkline Comms., Inc.*, 555 U.S. 438, 456 n.4 (2009). After all, "[a]t the time a complaint is filed, the parties are often uncertain about the facts and the law; and yet, prompt filing is encouraged and often required by a statute of limitations." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–59 (9th Cir. 2007). "[N]othing in the Federal Rules of Civil Procedure [] prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *Id*. at 860.

In any event, even Liu's allegations in the original complaint—although they should not be considered—*still* establish reliance. Again, Plaintiff Liu always pled he ***overpaid*** for the game

believing he owned it, and that this was material. FAC ¶ 13. Citing *Leong v. Square Enix of Am.*

*Hldgs., Inc.*, 2010 WL 11519184, at *3 (C.D. Cal. Jan. 20, 2010) ("*Leong I*"), Defendant claims

Plaintiff Liu's subsequent purchase of a spin-off game contradicts his claims of reliance. MTD at

14-15. *Leong I* said a plaintiff's "repurchase suggests that knowledge of the terms and conditions in

2005 would not have dissuaded Plaintiff from *buying the game*." 2010 WL 11519184, at *3

(emphasis added). But as the Ninth Circuit and the California Supreme Court have repeatedly held

after *Leong I*, "To establish reliance under the CLRA, a misrepresentation need not be 'the *sole* or

even the *decisive* cause of the injury-producing conduct.'" *Lytle v. Nutramax Lab'ys, Inc.*, 114

F.4th 1011, 1036 (9th Cir. **2024**) (quoting *Moore*, 966 F.3d at 1020 (in turn quoting *Kwikset*, 51

Cal.4th at 327)) (emphasis in original). So, to the extent this unpublished opinion from **2010** says

something else, it does not control here.

And even if a misrepresentation was not "*decisive*" in a consumer's decision to make a

purchase, it can still contribute to consumers decision and it can certainly alter the calculus of how

much a consumer would pay. Indeed, a consumer could have still ***overpaid*** for the game the first

time believing he or she was receiving the full bundle of sticks. FAC ¶¶ 13, 63 (Plaintiff alleging

harm due to overpayment); *see, e.g.*, *In re Amazon*, 2024 WL 1138906, at *3 (plaintiffs had Article

III standing by alleging "they overpaid for a purchase they otherwise would not have paid for

because they did not get the full value of their purchase, owning outright vs purchasing a limited

license.").

## II.    DEFENDANT'S TIMELINESS ARGUMENTS FAIL

### A.    Defendant's Timeliness Arguments Are Inappropriate At This Stage

Defendant focuses a substantial portion of its MTD arguing that Plaintiffs' claims are time-

barred. MTD at 5-12. Defendant's argument is premature.

Whether "any statute of limitations period has passed" is "generally determined by matters

outside of the pleadings" and therefore is inappropriate for resolution at this stage. *Lawrence v.*

*Finicity Corp.*, 716 F. Supp. 3d 851, 892 (E.D. Cal. 2024), *rev'd and remanded on other grounds*,

No. 24-1737, 2025 WL 547375 (9th Cir. Feb. 19, 2025). The only time when a limitations

1   argument is appropriately raised on a motion to dismiss is if "the running of the statute is apparent

2   on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

3   And "unless it is clear from the face of the complaint that the statute has run and that no tolling is

4   possible," the "Court cannot dismiss the FAC." *Hines v. Wells Fargo Home Mortg., Inc.*, 2015 WL

5   351818, at *2 (E.D. Cal. Jan. 26, 2015); *see also 24/7 Customer, Inc. v. 24-7 Intouch*, 2015 WL

6   1522236, at *3 (N.D. Cal. Mar. 31, 2015) (noting that the "Plaintiff's complaint could only be

7   properly dismissed on those grounds if the complaint itself contained factual allegations

8   demonstrating that Plaintiff definitively filed suit outside of the limitation period" but ultimately

9   denying the motion to dismiss for time-barred claims "[b]ecause such questions are premature").

10  Similarly, "[w]hether a plaintiff is entitled to delayed discovery is a factual question." *Hines*, 2015

11  WL 351818, at *2. Accordingly, both questions—(1) whether Plaintiffs' claims are time-barred,

12  and (2) whether the delayed discovery rule applies—are inappropriate for resolution at this stage,

13  and the Court should deny Defendant's MTD on the statute of limitations issue.

14         Ubisoft's own brief illustrates that its statute of limitations argument is ***not*** apparent on the

15  face of the FAC ***because Defendant relies on materials outside the FAC*** to argue its position.

16  MTD 10-12. Defendant points to Exhibits A and B attached to the Declaration of Brigitte Khoury

17  ("Khoury Decl."). MTD at 10-11. Exhibit A includes images of what Defendant describes as the

18  "full *The Crew* packaging labels." Khoury Decl. ¶ 1; *see* Exhibit A. Defendant states Exhibit B is

19  "Ubisoft's Terms of Use in effect … when Plaintiffs" purchased *The Crew*. Khoury Decl. ¶¶ 3-4;

20  *see* Exhibit B. Defendant also fails to properly seek that the Court incorporate these exhibits by

21  reference, which would allow the Court to assess the exhibits "as though they are part of the

22  complaint itself" and to "assume [the] contents are true for purposes of a motion to dismiss." *Khoja*

23  *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002, 1003 (9th Cir. 2018). Because Defendant's

24  argument that Plaintiffs could discover the misconduct sooner relies on these exhibits, which are

25  not included in the FAC, Defendant cannot say that the FAC makes clear on its ***face*** that the

26  delayed discovery rule does not apply. Based on this alone, the Court should refrain from assessing

27  the time-bar arguments at this stage. *Lawrence*, 716 F. Supp. 3d at 892; *Hines*, 2015 WL 351818,

28  at *2.

**B.      Plaintiffs Sufficiently Allege The Delayed Discovery Rule Applies To Their False Advertising-Based Claims**

Defendant argues that "Plaintiffs make no attempt to meet their burden to demonstrate an inability to discover the alleged misconduct sooner, beyond conclusory statements." MTD at 10.

To properly assert this rule, the plaintiff "must plead facts to show (1) the time and manner of discovery and (2) the inability to have made an earlier discovery despite reasonable diligence." *E–Fab, Inc. v. Accounts., Inc. Servs*., 153 Cal. App. 4th 1308, 1319 (2007) (internal citations omitted). And the plaintiff's duty to investigate is only triggered when the "plaintiff *has reason to suspect an injury and some wrongful cause*." *Id.* (internal citations omitted).

Plaintiffs allege detailed, non-conclusory facts about (1) the time and manner of discovery and (2) the inability to have made an earlier discovery despite reasonable diligence. Plaintiffs each allege when they discovered *The Crew*'s servers would be shut down, meaning when they discovered that their purchase of a *physical copy* of *The Crew* did not give them ownership over that physical copy, but only a license. FAC ¶¶ 83, 84, 85. Plaintiffs also allege they were unable to discover the wrongdoing earlier because it was not until December 14, 2023, when Ubisoft announced "that it would shut down the Game's servers" that Plaintiffs had "reason to discover the cause of action." FAC ¶¶ 86-87. These allegations, along with Plaintiffs' allegations that they "*bought* physical disks storing the Game data, which reasonably made them believe that they could input that disk into their computer or game console and play the game whenever they wanted," are sufficient to support application of the delayed discovery rule. FAC ¶ 3.

*Philips v. Ford Motor Co.*, 2015 WL 4111448, at *8 (N.D. Cal. July 7, 2015), is instructive. When ruling on a motion to dismiss, the court found that the delayed discovery rule applied to a case involving a vehicle steering defect. *Id.* The plaintiffs' claims were tolled because they had no "duty to reasonably investigate until the alleged steering defect manifested in their vehicles." *Id.* The plaintiffs also "had no reason to suspect wrongdoing, and there was no fact or circumstance to prompt an investigation." *Id.* Likewise here, Plaintiffs' allegations that the Ubisoft shutdown announcement was the event that gave them reason to discover the wrongdoing (FAC ¶¶ 86-87) makes this case like *Philips*. *See id.* The shutdown announcement is akin to the manifestation of the

steering defect in the vehicle in *Phillips*. *See id.* Before the announcement, Plaintiffs had no reason to suspect wrongdoing. *See id.*

Defendant relies on *Leong II*, 2010 WL 1641364, at *9-10, for its argument that the delayed discovery rule does not apply, but this case is distinguishable. MTD at 7. The court's decision not to apply the delayed discovery rule in *Leong* was premised on the fact that the plaintiffs had "reason [t]o discover the forfeiture clause" because that clause was contained in the "user agreement." *Id.* at *9. The *plaintiffs alleged* they were "required to consent to the user agreement prior to playing the game" which contained the forfeiture clause. *Id.* at *4. Thus, the court found that the plaintiffs "had reason [t]o discover the forfeiture clause when they opened their game account." *Id.* at *9.

But in the disappearing Apple iTunes movies case, the court rejected Apple's very same argument when it claimed the "iTunes Store terms and conditions alerted the plaintiffs (and other consumers) to the possibility that they might lose access to purchased digital content." *McTyere*, 663 F. Supp. 3d at 255. After all, "knowledge of the terms and conditions cannot be attributed to the plaintiffs because of the terms and conditions' *inconspicuous placement*." *Id*. at 256 (internal brackets and quotation marks omitted). This is because "reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from … small print on the side of the box." *Williams*, 552 F.3d at 939.

And here, far from being conspicuous, Ubisoft's Terms lie dormant on a random webpage on its website. As Ubisoft concedes, the language "see terms" only appear on the PlayStation package, but *Xbox package makes no reference to its Terms at all*. MTD at 24.

Worse still, even on the PlayStation package, Ubisoft puts consumers through what the Ninth Circuit calls "a hide-the-ball exercise." *Wilson*, 944 F.3d at 1221. It is one thing to disclose Terms on the packaging of the box and then give consumers the Terms in a manual inside the box. It is another thing entirely to simply give consumers the www.ubi.com URL on the box and then expect them to (1) go to a computer, (2) type the URL into a web browser, (3) navigate the Ubisoft website's main page, and (4) click through various links just to find the terms they are supposedly agreeing to, all before they even reach a checkout counter. Khoury Decl. ¶ 4; MTD at 10. The

Ninth Circuit in *Wilson* already warned video game publishers like Ubisoft that providing gamers with a URL of its website, while "fail[ing] to hyperlink the Terms [or otherwise make them readily available] … is the equivalent to admonishing a child to 'please eat your peas' only to then hide the peas." 944 F.3d at 1221. And it is not enough to bind gamers to their Terms. *Id.* As such, "Courts decline to enforce agreements where the terms are available only if users … complete a multiple-step process of clicking non-obvious links." *Id.* (collecting cases).

     *Wilson* is instructive. In *Wilson*, the court refused to enforce a video game app developer's terms where the app developer required players to take "multiple steps" just to find the terms. "He must first find and click on the three white dots representing the settings menu, tucked away in the corner and obscured amongst the brightly colored casino games. The 'Terms & Policy' tab within the settings is buried among many other links, like FAQs, notifications, and sound and volume." *Id.* Moreover, "[t]he user can play the game unencumbered by any of the settings … Only curiosity or dumb luck might bring a user to discover the Terms." *Id.*

     Several other courts came to the same conclusion. *Ajzenman v. Off. of Comm'r of Baseball*, 492 F. Supp. 3d 1067, 1078 (C.D. Cal. 2020) (refusing to enforce terms where "a user … had to navigate to different websites in order to find the terms, and had to complete a multi-step process of clicking non-obvious links"); *Ramirez v. Trusper, Inc.*, 2024 WL 4479862, at *6 (N.D. Cal. Oct. 11, 2024) (refusing to enforce terms because the "the multi-step process an internet user must endure to reach the 'terms page' hyperlink further minimizes the chance that they will receive notice of the terms of the Participation Agreement"). Simply put: "It stretches credulity to assert that the actual page that is linked to the application [plaintiff] filled out does not govern that application, but rather another page linked to the page that is linked to the application does." *McGhee v. N. Am. Bancard, LLC*, 2017 WL 3118799, at *4 (S.D. Cal. July 21, 2017), *aff'd*, 755 F. App'x 718 (9th Cir. 2019).

     Worse still, Defendant provides no information that would lead the Court to believe that Plaintiffs ***ever even agreed*** to Ubisoft's terms. "Reasonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, not merely see them." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1158 (9th Cir. 2025).

1    Accordingly, the Court should find Plaintiffs sufficiently allege the delayed discovery rule

2    applies to their false advertising-based claims[3] and deny the MTD on these grounds.

3          **C.    Plaintiff Cerrato's EFTA Claims Are Not Time-Barred**

4    Citing no authority, Defendant argues that Plaintiff Cerrato's EFTA claim is time-barred

5    because "actions thereunder accrue when the gift certificate, store gift card, or prepaid card subject

6    to expiration is *sold* or *issued*." MTD at 6. Not necessarily. The law states that "any action under

7    this section may be brought … within one year from the date of the *occurrence of the violation*."

8    15 U.S.C. § 1693m(g) (emphasis added). And the provision Plaintiff brings a claim under makes it

9    "unlawful for any person to sell or issue a gift certificate, store gift card, or general-use prepaid

10    card *that is subject to an expiration date.*"

11    Yet at the time the Crew Credits were sold, they were not "subject to an expiration date"

12    and so no violation of the EFTA had yet occurred. Indeed, before shutting down the game, Ubisoft

13    does not appear to have made any announcements about the fate of the Crew Credits. And so, the

14    Credits only became "*subject to an expiration date*" on March 31, 2024, the day the game's servers

15    were shut down. Accordingly, Plaintiff Cerrato's March 18, 2025 claim was timely.

16          **D.    Plaintiff Cerrato Sufficiently Alleges The Delayed Discovery**
               **Rule Applies To His EFTA Claim**

17    Contrary to Ubisoft's claims "California federal courts have [***not***] concluded that 'the

18    discovery rule does not apply to the EFTA.'" MTD at 11 (internal citation omitted). In fact, at least

19    *four* California federal courts did apply the discovery rule to EFTA claims. "Defendant's assertion

20    that the statute of limitations for Patterson and Adams' EFTA claims has expired lacks merit …

21    Both Adams and Jordan filed suit within one year ***of discovering the transactions***, and included

22    sufficient factual allegations regarding their inability to discover the transactions earlier based on

23    complete unawareness of the accounts ***to support application of the discovery rule*.**" *Patterson*,

24    2024 WL 5339479, at \*3, n.1 (emphasis added); *accord Cortes v. Univ. & State Emps. Credit*

25    *Union*, 2023 WL 12009972, at \*10 (S.D. Cal. Mar. 13, 2023); *Harvey v. Google Inc.*, 2015 WL

26    9268125, at \*4 (N.D. Cal. Dec. 21, 2015); *Park v. Webloyalty.com, Inc.*, 2014 WL 4829465, at \*5-

---

[3] This includes Plaintiffs' CLRA, FAL, UCL, Fraud, and Breach of Warranty claims.

6 (S.D. Cal. Sept. 29, 2014), *aff'd,* 685 F. App'x 589 (9th Cir. 2017). Accordingly, there actually appear to be *more California federal courts applying the discovery rule to EFTA claims* than the other way around.

Indeed, even one of the two cases Ubisoft relies on was careful to note: "The Ninth Circuit has not decided whether the discovery rule applies to EFTA violations." *Gomez*, 2024 WL 2243243, at *5. Worse yet, in the only two cases Defendant relies on, *Gomez*, 2024 WL 2243243, at *5 and *Widjaja v. JPMorgan Chase Bank, N.A.*, 2019 WL 8108716, at *6 (C.D. Cal. Nov. 19, 2019), the courts were addressing a different section of EFTA *concerning unauthorized transfers*. In those cases, "the Court notes that the discovery rule will often not apply in the context of EFTA claims because a plaintiff could reasonably discover an injury by reviewing his or her bank statement or online account." *Gomez*, 2024 WL 2243243, at *6. But this is not the case with Plaintiff Cerrato's EFTA claim. *See* FAC ¶¶ 64-77.

## III.    PLAINTIFFS PLAUSIBLY ALLEGE VIOLATIONS UNDER THE CLRA, FAL, AND UCL

Defendant argues "Plaintiffs fail to identify an actionable omission or misleading or untrue statement" because "Plaintiffs do not allege that Ubisoft made any statements indicating that consumers would, in fact, obtain unfettered access to *The Crew* if they purchased a physical copy." MTD at 18. Defendant also argues that Plaintiffs do not plausibly allege that their "reliance on the foregoing statements or omissions satisfies the reasonable consumer standard." *Id.* at 21. Defendant is wrong.

A plaintiff plausibly alleges violations under the CLRA, FAL, and UCL by pleading that the defendant's representations or omissions will likely deceive or confuse reasonable consumers. *Williams*, 552 F.3d at 938. Moreover, whether a representation or omission would deceive reasonable consumers "will usually be a question of fact not appropriate for decision" at this stage. *Andino*, 2021 WL 1549667, at *4 (internal citations omitted). "Only in rare situations is granting a motion to dismiss on this basis appropriate." *Id.*

Here, Plaintiffs sufficiently allege Defendant made actionable representations "when looking at the totality of *The Crew*'s packaging." FAC ¶ 58. Specifically, Plaintiffs allege that by

selling "physical cop[ies] of the Game, Ubisoft represented to consumers that they were purchasing a copy of the Game and were therefore obtaining the full bundle of traditional ownership rights over that copy of the Game instead of a license" and further, that "they would be able to play the Game at any time … simply by putting the disk in their console." *Id.* ¶ 60. Plaintiffs allege the Product's physical attribute as an affirmative representation along with language on the Product's packaging, such as "'1 PLAYER' functionality" (signaling the single-player portion of the game) and "SCEA may retire the online portion of this game at any time" which "affirmatively misleads consumers to believe there is an ***offline portion*** of the Game." *Id.* ¶ 58.

Plaintiffs also provide allegations with the relevant context under which to analyze these representations. Defendant's action of selling *physical disks* of *The Crew* (in other words, representing the Product as a *physical good*) is meaningful because physical goods are known as the purchasing option that gives "all [] property rights," unlike a digital good that will only provide "fleeting access." *Id.* ¶ 50. Consumers are "still accustomed to having the assurance of obtaining all their property rights if they chose to purchase a physical good instead of the digital one." *Id.* This assurance transfers over to the video game context. *Id*. Further, video games can be single-player and/or multi-player games. *Id.* ¶¶ 21, 27. "Traditionally speaking, video games in single-player mode do not require an internet connection," essentially being an "offline" option of a game. *Id.* ¶ 27. Therefore, because Defendant represents *The Crew* has a single-player portion ("1 PLAYER"), Defendant leads reasonable consumers to believe that, at the very least, that portion of the game is operated not on servers but on the physical disk copies Defendant sold. *Id.* ¶¶ 3, 58-60. Therefore, even though Defendant represents that it "may retire the *online portion* of this game at any time," a reasonable consumer would believe that this statement would *not* include the single-player portion of *The Crew*. *Id.* ¶¶ 27, 58, 59.

As fully described below, these allegations sufficiently constitute affirmative representations by Defendant and Plaintiffs have sufficiently alleged reasonable consumers would rely on these representations and be similarly misled.

### A. Plaintiffs Plausibly Allege Defendant Made Affirmative Representations

Defendant first argues that Plaintiffs have failed to identify any affirmative representations "indicating that consumers would, in fact, obtain unfettered access to *The Crew* if they purchased a physical copy." MTD at 18. Plaintiffs' allegations are like those in *McKay*, 2023 WL 3549515 at *1, 6-7. There, the plaintiff alleged the defendant misled consumers into believing its malt beverage sold at gas stations was the same as its more expensive, hard liquor whisky product. *Id.* at *1. The plaintiff based his theory on a combination of the defendant's representations, including, the "shot-size bottle common for hard liquor" that the defendant used for its malt and whisky product, the dragon logo on both products, "the same color scheme," "the words 'RED HOT,'" and "CINNAMON" (among other representations). *Id.* at *6. The court found that "taken as true, the complaint sufficiently alleges that Sazerac's label and packaging are affirmatively misleading." *Id.* The court held that several "features of the Whisky Malt packaging could affirmatively mislead consumers: for instance, … insinuating that Fireball Malt was as strong as Fireball Whisky by packaging it in a 'shot' size, []; deceptively labeling Fireball Malt and Fireball Whisky with nearly identical packaging, []; using ambiguous wording in the composition list on the label []." *Id.* The court added that even though the malt product labels "do indeed accurately state that Fireball Malt has an ABV of 16.5% and Fireball Whisky has an ABV of 33%, a reasonable consumer would still be confused or misled by the labels when making the purchase." *Id.* The defendant also argued that the language on the label, "TASTES LIKE SMOOTH WHISKY" would imply to consumers that the malt product was not whisky. *Id.* at *7. The court rejected that argument by noting that it "should not impose on the ordinary consumer an obligation to conduct extensive linguistic analysis on their grocery shopping runs." *Id.* The defendant argued that the plaintiff should not have been misled because he should have known that the "products he bought in a gas station were not whisky" given gas stations "are not licensed to sell hard liquor." *Id.* The court also rejected this argument, noting it should consider "all the information available to consumers and the context in which that information is provided and used." *Id.* (internal citations omitted). And by considering all the context, the court determined that a reasonable consumer could nonetheless believe they

1    were purchasing whisky because of an unawareness "of which establishments hold which liquor

2    license types" or if the consumer were to assume the "store is not complying with the terms of its

3    liquor license." *Id.*

4          Plaintiffs also rely on Defendant's affirmative representations. McKay relied on the product

5    packaging language and the packaging itself—the "shot-size bottle common for hard liquor." *Id.* at

6    *6. Here too, Plaintiffs rely on the packaging itself—the physical disk version of *The Crew*—along

7    with language from the packaging. FAC ¶¶ 58-60. As in *McKay*, where the bottle's size was

8    considered a representation that the malt beverage was hard liquor, here, the *physical disk*

9    represents the Product as something it is not—a disk that has the game data directly on it and thus

10   is not subject to a limited license. *Id* ¶ 3 ("falsely represented that *The Crew* itself was encoded

11   onto physical disks"); *see* 2023 WL 3549515, at *6.

12         While the defendant in *McKay* noted its packaging representations that the product was a

13   malt beverage with a low alcohol level, meaning it was not whisky, the court nevertheless held a

14   reasonable consumer could be misled into thinking they were getting whisky considering the

15   overall context. 2023 WL 3549515, at *6. Here, too, Defendant points to other language on the

16   packaging it claims makes "clear that Ubisoft could limit access." MTD at 18. But when

17   considering the context Plaintiffs provided regarding single-player functionality, offline play, and

18   the presumption of ownership for *physical* goods, the Court should likewise find a consumer would

19   still be misled by Defendant's representations. *See id*; FAC ¶¶ 21, 27, 50, 58-60.

20         Defendant relies on various cases for its argument that Plaintiffs did not plead any

21   affirmative representations, but none are apt. In *Leong II*, 2010 WL 1641364, at *10, the court

22   noted that the plaintiffs did not provide "facts to support their allegation that Defendants

23   represented that users would 'own' the game data; Plaintiffs only allege what Defendants' failed to

24   disclose at the point of sale." Unlike *Leong II*, Plaintiffs allege both Defendant's failure to disclose

25   material information, FAC ¶¶ 56-57, and its representations, *id.* ¶¶ 58-60. Similarly, in *Garcia v.*

26   *Sony Comput. Ent. Am., LLC*, 859 F. Supp. 2d 1056, 1064 (N.D. Cal. 2012), the plaintiff only

27   identified "PS3 logos" on the product packaging, and alleged that they "would deceive a

28   reasonable consumer into believing that all such branded games must be compatible with all PS3

1   models in perpetuity." *Id.* The court found that even if the CLRA claims were not time-barred,

2   these representations were not affirmative representations because the theory the plaintiff alleged

3   was a "specific, and fairly extreme, understanding of the logos." *Id.* To the contrary, here,

4   Plaintiffs' understanding is not extreme, and they provide sufficient context to support how and

5   why reasonable consumers would come to the same conclusions. FAC ¶¶ 21, 27, 50, 58, 59; *see*

6   *McKay*, 2023 WL 3549515, at *6-7. In *Morgan v. Harmonix Music Sys., Inc.*, 2009 WL 2031765,

7   at *3 (N.D. Cal. July 7, 2009), the court found that the representation that the game "could be

8   played with drums" was too vague to support the plaintiffs' theory that the representation was

9   misleading given the drum "pedal eventually failed." But unlike *Morgan*, Plaintiffs here point to

10  multiple representations related to the online/offline nature of the game and the existence of a

11  license and are thus, not vague. FAC ¶¶ 58-60. Lastly, in *Farley v. GameStop Corp.*, 2013 WL

12  4042434, at *3 n.2 (D.N.J. Aug. 7, 2013), the plaintiffs did not allege an affirmative

13  misrepresentation because while the representation told consumers they saved money by buying

14  the defendant's used products, the plaintiffs did in fact "pay less" than they would have for new

15  products. But here, Plaintiffs allege Defendant's representations lead consumers to believe they

16  obtained ownership over the game, when in fact, they only obtained a license. FAC ¶¶ 58, 60.

17      Defendant also incorrectly argues that Plaintiffs "skew[s] certain packaging statements as

18  alleged representations conferring ownership rights. MTD at 19. Defendant argues the product

19  representations that "UBISOFT MAY CANCEL ACCESS TO ONE OR MORE SPECIFIC

20  ONLINE FEATURES" and that "the online portion of this game" could be "retire[d]" are not

21  misleading because the packages "inform consumers that online connectivity was required to play

22  *The Crew*." *Id.* First, Defendant relies on Exhibit A of the Khoury Decl. for these arguments. *Id.*

23  But as described in Section. II.A-B above, Defendant cannot rely on Exhibits outside the FAC.

24  Nonetheless, Defendant's argument is meritless. As Plaintiffs describe above, even with knowledge

25  that *The Crew* required online connectivity, Defendant also made representations that there was a

26  single-player portion of the game, FAC ¶ 58, and Plaintiffs provide context as to why consumers

27  would believe that the single-player portion would not need internet connection and would not be

28  operated on servers. *Id.* ¶¶ 21, 27, 50, 58, 59. Therefore, as explained above (Section III, discussing

1    the context Plaintiffs provided in the FAC), Plaintiffs' understanding of Defendant's

2    representations is not based on their "own unreasonable and unfounded assumptions." MTD at 20;

3    *See McKay*, 2023 WL 3549515 at *6.

4          **B.     Plaintiffs Plausibly Allege Reasonable Consumers Would Rely**
             **On Defendant's Representations And Omissions**
5

6          Defendant argues Plaintiffs do not "plausibly allege that Plaintiffs' reliance on the

7    foregoing statements or omissions satisfies the reasonable consumer standard." Again, Defendant

8    is wrong. Because Plaintiffs provide context as to (1) why consumers would believe that the single-

9    player portion would not need internet connection, (2) why it would not operate on servers, and (3)

10   why the *physical* disk reinforces these beliefs, Plaintiffs sufficiently allege a reasonable consumer

11   would likewise be misled. *See* FAC ¶¶ 3, 21, 27, 50, 58, 59.

12         On the whole, this case is quite similar to *Andino*, 2021 WL 1549667, at *1, 4, where the

13   court found that reasonable consumers who purchased *digital* goods, "would expect their access

14   couldn't be revoked" when buying "movies, television shows, music and other content" from

15   Apple's iTunes application only because Apple represented consumers could "Buy" the product.

16   The court made this finding even though Apple argued—just as Ubisoft does here—that "'[n]o

17   reasonable consumer would believe' that purchased content would remain on the iTunes platform

18   indefinitely." *Id.* at *4.

19         Similarly, in *McTyere v. Apple, Inc.*, 663 F. Supp. 3d at 255, the court found that when

20   "[d]rawing every inference in the plaintiffs' favor at this stage, … reasonable consumers might

21   have been misled when they purchased digital content [on iTunes] with the mistaken impression

22   that the content could not later be removed from their libraries." The court reasoned that

23   "reasonable consumers might have believed that their purchasing digital content from the iTunes

24   Store gave them the ability to use that digital content indefinitely—not merely the right to use it for

25   some limited time" when choosing the option to "buy" the digital content. *Id.* Apple argued that

26   "iTunes Store terms and conditions alerted the plaintiffs (and other consumers) to the possibility

27   that they might lose access to purchased digital content." *Id.* The court first noted that "the parties

28   dispute whether consumers are in fact sufficiently informed" by the terms and conditions and that

1    "that sort of factual dispute is not ordinarily amenable to resolution on a motion to dismiss." *Id.* at

2    255-56. At any rate, the court determined that "[a]lthough [the terms language] might "apprise

3    users about the possibility that digital content might not be available in the iTunes Store

4    indefinitely, this Court cannot—at least at this stage—conclude that it forecloses the plaintiffs'

5    claims" and that "consumer[s] might read those terms and conditions and nevertheless believe that

6    once [they] [] 'purchased' digital content and that content is saved to his or her 'purchased' folder,

7    Apple cannot at that point suspend or terminate access to it." *Id.*

8        And in *In re Amazon Prime Video Litigation*, 2024 WL 1138906, at *4, the court also found

9    that by enabling consumer purchases with a "Buy" button, "Plaintiffs [] sufficiently alleged that the

10   word "buy" … could be materially misleading to the reasonable consumer." Specifically, the

11   plaintiffs argued consumers would believe they "acquire[d] *possession* and *ownership* of" the

12   digital good. *Id.* at *3. They further argued that consumers would not "expect Amazon to return to

13   their homes to repossess items after delivery." *Id.*

14       Plaintiffs in these cases purchased *digital* content, which is generally understood not to

15   confer ownership rights, FAC ¶ 50. Even so, courts found that by labeling the transaction as a

16   "Buy," consumers would be misled into thinking they were obtaining ownership rights over digital

17   content, even *despite* terms stating the contrary. *See Andino,* 2021 WL 1549667, at *4; *McTyere*,

18   663 F. Supp. 3d at 255; *In re Amazon*, 2024 WL 1138906, at *4. The same reasoning applies here,

19   even if Defendant did not explicitly state that the *physical* disk would confer ownership rights. *See*

20   *id.*; FAC ¶¶ 3, 21, 27, 50, 58, 59; Section III. (explaining the context). Thus, reasonable consumers'

21   reliance on these representations is reasonable. *See id.*

22       Defendant cites *Williams v. Gerber Prods. Co.*, 552 F.3d at 938 for its argument, but

23   *Williams* supports Plaintiffs' position. In *Williams*, the Ninth Circuit found it inappropriate to grant

24   the motion to dismiss for failure to state a CLRA claim, given the defendant's representations of "a

25   number of different fruits, potentially suggesting (falsely) that those fruits or their juices are

26   contained in the product." *Id.* at 939. The Ninth Circuit found reasonable consumers would "be

27   deceived by the [] packaging," despite the ingredient list that clarified the only fruit in the product

28   was grape juice. *Id.* at 936, 40. The images of fruit are similar to the physical disk here because

1    they are both non-textual representations that lead consumers to make an inference about the

2    product. *See id.* 936, 939-40; FAC ¶¶ 3, 21, 27, 50, 58, 59.

3         Defendant also argues Plaintiffs' reliance allegations are conclusory, and insufficient given

4    "Rule 9(b)'s heightened pleading standard." MTD at 21 (citing *Harris v. McDonald's Corp.*, 2021

5    WL 2172833, at *2 (N.D. Cal. Mar. 24, 2021)). But Plaintiffs' CLRA, FAL, and UCL claims are

6    not based in fraud. *See Caldwell v. Nordic Nats., Inc.*, 709 F. Supp. 3d 889, 904 (N.D. Cal. 2024)

7    (noting Rule 9(b) does not apply to all CLRA claims, particularly "where California consumer

8    protection claims derive from purportedly misleading statements made on a product's label, rather

9    than a course of conduct over time, as is the case here, the Ninth Circuit does not apply the

10    heightened Federal Rule 9(b) standard"). Still, *Harris v. McDonald's Corp.* is distinguishable

11    because unlike the plaintiff there, who did not provide "additional facts to 'nudge' her claim

12    'across the line from conceivable to plausible[,]'" Plaintiffs here do provide allegations of

13    contextual background to nudge their claims. 2021 WL 2172833, at *2; *see* FAC ¶¶ 3, 21, 27, 50,

14    58, 59. Defendant's reliance on *Cullen v. Netflix, Inc.*, 2013 WL 140103, at *1 (N.D. Cal. Jan. 10,

15    2013) is also unavailing for the same reasons.

16         Defendant further argues that a "reasonable modern video game consumer would fully

17    understand they were purchasing a limited license to play *The Crew*" by pointing to fine print on

18    the packaging, and Plaintiffs' supposed "general knowledge" of the use of servers in gaming. MTD

19    at 21-22. Ubisoft's attempt to impose a higher reasonable consumer standard on gamers is

20    inappropriate. Unlike *Moore v. Trader Joe's Co.*, 4 F.4th 874, 884 (9th Cir. 2021) ("*Trader*

21    *Joe's*")—which involved purchasers of manuka honey—a video game (unlike manuka honey) is

22    not "a niche, specialty product" but a commonplace product. "[C]onsumers of everyday items *are*

23    *not expected to study labels with the same diligence as consumers of specialty products.*" *Whiteside*

24    *v. Kimberly Clark Corp.*, 108 F.4th 771, 782 (9th Cir. 2024) (emphasis added). And so, consumers

25    of video games are not expected to "exhibit a higher standard of care," "study [the packaging] with

26    great diligence," or "know more than most about" video games or how they work. *Trader Joe's*, 4

27    F.4th at 884.

28

1    Defendant also misconstrues the background information Plaintiffs' counsel provided about

2    video games and how they work, arguing it is "Plaintiffs['] [] general knowledge." MTD at 22. It is

3    not. Plaintiffs' counsel provided this background information so that the Court could understand

4    the issue at hand precisely because it is not intuitive information. *See* FAC ¶¶ 20-36. But at any

5    rate, even these general allegations about the practice of creating patches for "single player

6    option[s] of the game," FAC ¶ 34, only further reinforce Plaintiffs' beliefs that because *The Crew*

7    included a single-player portion of the game, that portion would be playable offline and safe from

8    server shutdowns. *See* FAC ¶ 3 ("representing to consumers that an offline portion of the Game

9    existed that would be unaffected"); *id.* ¶¶ 58-60.

10    Lastly, Exhibit A language, "CANCEL ACCESS" and that the game is "subject to license,"

11    does not alter the conclusion. *See McKay*, 2023 WL 3549515, at *6 (considering language on the

12    packaging that specified the product was a malt beverage with low alcohol content but finding

13    consumers would still believe the product is whisky); *McTyere*, 663 F. Supp. 3d at 255 (finding

14    that although consumers may read the terms subjecting iTunes digital content to a license,

15    reasonable consumers may still believe purchasing digital content gives them ownership).

16    Defendant's reliance on *La Barbera v. Ole Mexican Foods Inc*., 2023 WL 4162348, at *11

17    (C.D. Cal. May 18, 2023) fails because there, all that was required was a "'simple analysis' of the

18    packaging" for consumers to discovery the answer to a simple question—were the tortillas made in

19    Mexico? But here, even when going through an analysis, as described above, reasonable consumers

20    would believe that the ***physical*** product confers ownership rights, at least, for the offline portion of

21    the game. *See* FAC ¶ 3 ("representing to consumers that an offline portion of the game existed that

22    would be unaffected"); *id.* ¶¶ 58-60. *Disney Enters., Inc. v. Redbox Automated Retail, LLC*, 336 F.

23    Supp. 3d 1146, 1150, 1156 (C.D. Cal. 2018) is likewise unavailing. First, this is a copyright

24    infringement case, not addressing the reasonable consumer standard. *Id.* at 1149-50. Second, the

25    alleged copyright infringement involved the sale of ***codes*** to download films. *Id.* Therefore,

26    consumers would be more likely to understand that a ***code*** to download a digital movie is subject to

27    a license as compared to a ***physical disk***. *See id.* at *11; FAC ¶¶ 3, 58-60. But even then, *Andino*

28    2021 WL 1549667, at *4, *McTyere*, 663 F. Supp. 3d at 255, and *In re Amazon*, 2024 WL 1138906,

1    at *4, all support the conclusion that reasonable consumers would still be misled. Further,

2    *McMahon v. Take-Two Interactive Software, Inc.*, 2017 WL 11681048, at *4 (C.D. Cal. Apr. 19,

3    2017), is distinguishable because there, the consumer would be interested in one particular feature

4    of the game, meaning they would pay special attention to whether the game contained that

5    feature—a factor that is not relevant here. *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225,

6    1229-30 (9th Cir. 2019) is also distinguishable because there, the interpretation of the word "diet"

7    was uncommon, but here, Plaintiffs' interpretation of the representations is supported. *See* FAC ¶¶

8    3, 21, 27, 50, 58-60. Lastly, *Panelli v. Target Corp.*, No. 24-CV-01218, 2024 WL 4596412, at *3-4

9    (S.D. Cal. Oct. 28, 2024) is distinguishable because there, the decision that reasonable consumers

10    would not interpret the thread count representations the way the plaintiff did was based on the

11    plaintiff's allegations that "thread count representations at issue were physically impossible to

12    achieve"—similar allegations of impossibility do not exist here.

13         Plaintiffs also allege an actionable omission. FAC ¶ 56-57. An "omission must be contrary

14    to a representation actually made by the defendant, or an omission of a fact the defendant was

15    obliged to disclose." *McKay*, 2023 WL 3549515, at *8 (internal citations omitted). Plaintiffs allege

16    Defendant omitted the material fact that the Product only confers a license, not ownership rights

17    which "goes to the central function of the product"—that being "the ability for a user to play the

18    game they paid for." FAC ¶ 57. Defendant in fact did curtail consumer's ability to play the game

19    by shutting down the game's servers. *Id.* These allegations are like those in *McKay*, that the

20    omission of the material fact that the beverage was malt, not whisky, went to the central function of

21    the product (the alcohol's strength). 2023 WL 3549515, at *8. These allegations were sufficient,

22    even considering that the packaging contained representations of the product being a malt beverage

23    and its low alcohol content. *Id.* at *7. Therefore, here too, even though Defendant makes some

24    representations it claims are about the license[4], MTD at 20-21, Plaintiffs still allege actionable

25    omissions. *See* FAC ¶ 57; *McKay*, 2023 WL 3549515, at *8. *Castillo v. Prime Hydration LLC*,

26

27

28    ───────────────

     [4] *See* Section I.A. discussing the packaging representations Defendant relies on.

1    2024 WL 4133815, at *7 (N.D. Cal. Sept. 9, 2024) is irrelevant because there, the plaintiff alleged

2    the omission based on the unreasonable safety hazard test, not the central function.

3            Because Plaintiffs sufficiently allege claims under the CLRA and FAL, these claims

4    sufficiently serve as predicate offenses for Plaintiffs' claim under the UCL. *See, Williams*, 552 F.3d

5    at 938. Thus, Defendant's arguments that Plaintiffs' UCL claims fail, are meritless. *Id.*

6            Accordingly, the Court should find Plaintiffs plausibly allege claims under the CLRA,

7    FAL, and UCL.

8    **IV.    PLAINTIFFS PLAUSIBLY ALLEGE FRAUD CLAIMS**

9            First, Defendant argues "Plaintiffs' common law fraud claims should be dismissed as

10   redundant" because they asserted fraud claims along with "fraudulent inducement and fraudulent

11   misrepresentation." MTD at 24. Plaintiffs' allegations are not redundant.

12           Defendant relies on *Flores v. Gain Cap. Grp., LLC*, 2018 WL 6133644 (C.D. Cal. June 20,

13   2018), but this case does not call for a dismissal of claims and is also distinguishable. There, the

14   plaintiff alleged fraudulent inducement, intentional misrepresentation, fraudulent solicitation,

15   concealment, fraud, and nondisclosure. *Id.* at *4. Notably, the court did not see the need to strike

16   the fraudulent inducement or fraudulent misrepresentation claims—which are the two other types

17   of fraud claims Plaintiffs assert here besides fraud. *See id.*; FAC Count V, VI, VII. Instead, the

18   court found it necessary to **strike** the **fraudulent solicitation** claim, noting that it is not a "cause of

19   action under California law" and that it was redundant to the "cause of action for intentional

20   misrepresentation." *Id.* at *5. The court did ***not*** say fraudulent misrepresentation, inducement, and

21   fraud were redundant when compared with each other. *See id.* So, the *Flores* court's decision to

22   strike does not apply here. *See* Count V, VI, VII (not including fraudulent solicitation). Moreover,

23   the court's response was to strike the claims, not dismiss the claims. 2018 WL 6133644, at *5.

24   "Motions to strike, however, 'are generally regarded with disfavor' … [and] should only be granted

25   if 'the matter has no logical connection to the controversy at issue *and* may prejudice one or more

26   of the parties to the suit.'" *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121,

27   1128 (N.D. Cal. 2009).

28

1

2

3

4

Second, Defendant argues "Plaintiffs' fraud claims are defective for the same reasons that their CLRA, FAL, and UCL claims require dismissal." Defendant is wrong. Plaintiffs point to the discussions above in Section III. Accordingly, Plaintiffs have plausibly alleged their fraud-based claims.

5

6

**V.    PLAINTIFF CERRATO PLAUSIBLY ALLEGES A VIOLATION OF EFTA AND CAL. CIV. CODE § 1749.5.**

7

8

9

10

11

Defendant argues Plaintiff Cerrato failed to allege an EFTA violation because (1) the FAC "cannot—establish that Crew Credits fit the statutory definition of a 'gift certificate' or 'gift card;'" (2) "Plaintiff Cerrato affirmatively pleads that Crew Credits are reloadable;" and (3) "does not adequately allege that Crew Credits were subject to an expiration date." MTD at 25-26.[5] Not so.[6] First, Plaintiff Cerrato sufficiently alleges the Crew Credits ("CC") "constitute both 'gift certificates' and 'store gift cards' under EFTA." FAC ¶¶ 70-77, 150.

12

13

14

15

16

17

18

19

20

21

22

23

24

CC are like the Series Certificate in *Cody v. SoulCycle Inc.*, 2016 WL 4771392, at *3. There, the court found Series Certificates used to obtain classes were gift certificates. *Id.* at *3-5. The court noted the customer account where the Series Certificates were held could be reloaded by purchasing more Series Certificates, but a Series Certificate itself was not reloadable. *Id.* at *5. Plaintiff too clarifies that a CC itself "has a fixed value that cannot be increased" and are therefore "not reloadable" even though the "digital wallet" holding the CC "can be increased" by purchasing more CC. FAC ¶ 74. Therefore, Defendant's argument that CC cannot qualify as gift certificates because "Plaintiff Cerrato alleges that each consumer's 'digital wallet of Crew Credits can be increased and reloaded,' is taken out of context and does not support that the CC themselves can be reloaded. *See id.* Defendant also argues CC are not store gift cards because the FAC does not "allege that Crew Credits were purchased on a prepaid basis under § 1693*l*-1(a)(2)(B)(iii)." MTD at 26. This is wrong. Plaintiff alleges CC are "purchased on a prepaid basis in exchange for

25

26

27

---

[5] Plaintiff Cerrato points to Section II.C. above addressing the time-bar argument. Regarding Defendant's reference to Exhibit B. of the Khoury Decl., Plaintiff also points to Section II.B. above, regarding Defendant's improper reference to materials outside of the FAC and the fact that Defendant provides no basis to support its argument that Plaintiff was even provided notice of the terms discussed.

[6] Notably, Defendant offers underdeveloped arguments and only cites one case related to Cal. Civ. Code § 1749.5, but not EFTA.

28

1    payment given that a consumer will purchase Crew Credits with U.S. dollars before being able to

2    pay for an in-game purchase." FAC ¶ 75 (internal quotations omitted). Next, Defendant argues the

3    FAC does not allege CC "constitute a store of monetary value that can be 'redeem[ed]' or

4    'honor[ed]' under § 1693*l*-1(a)(2)(B)(i) or (iv)." MTD at 26. This is again false because Plaintiff

5    alleges "for both gift certificates and store cards, Crew Credits are 'honored upon presentation by

6    such single merchant' because Ubisoft accepts Crew Credits from consumers for in-game

7    purchases." FAC ¶ 76. Defendant points to no case law to support its argument that Plaintiff's

8    allegations are insufficient. The Court should therefore take Plaintiff's allegations as true. *See*

9    *Cody*, 2016 WL 4771392, at *4.

10        Defendant also argues CC "fall within the EFTA's exclusion for 'electronic promise[s]' that

11   are 'reloadable and not marketed or labeled as a gift card or gift certificate.'" MTD at 26. But

12   again, as discussed above, Plaintiff Cerrato specifically alleges that "Crew Credits are not

13   reloadable because each purchase for Crew Credits is a separate transaction. Once a Crew Credit is

14   redeemed, the consumer cannot reload that Crew Credit. The consumer will simply replace that

15   Crew Credit with a new one if the consumer purchases more Crew Credits." FAC ¶ 74. Indeed, in

16   *Cody*, 2016 WL 4771392, at *5, a nearly identical type of electronic crediting system was also

17   found to not be reloadable.

18        Lastly, Defendant argues "Plaintiff Cerrato fails to plead that Ubisoft actually sold Crew

19   Credits that were 'subject an expiration date.'" MTD at 26. But this is a non-issue. In *McKee*, the

20   court found that McKee's EFTA claim was sufficiently plead when alleging his credits expired

21   upon his cancelation of his membership. *McKee*, 2017 WL 7388530, at *15, 18-19. Before

22   cancelling the membership, Audible provided consumers with notice that their credits would expire

23   upon cancellation. *Id.* at *11 n.2. Thus, providing an exact expiration date at the time of purchase is

24   not required to plausibly allege a violation under EFTA. *See id.* at *15, 18-19. Further, Defendant

25   overstates the holding in the only case it cites, *Freeman v. Wal-Mart Stores, Inc.*, 111 Cal. App. 4th

26   660, 662 (2003). The *Freeman* case was ***specific*** to Cal. Civ. Code § 1749.5, a claim which

27   Defendant does not appear to even challenge. *See id.*; MTD at 25-27. The court noted that there

28   was no "predetermined expiration date at which time the card ***loses its entire value***." *Freeman*, 111

1    Cal. App. 4th at 666 (emphasis added). To explain that point, the court stated that "[t]here is no

2    fixed date as to when the card expires. Even if there is a $0 balance, the cardholder may add money

3    to the balance and continue using the card if the card account has not been canceled." *Id.*

4    Essentially, the court was focused on when the card would actually be unusable or when the

5    account would be cancelled. *See id.* Here, that happened when Defendant shut down the game's

6    servers and thus, there was a predetermined (as of the date Defendant publicly announced the

7    shutdown) expiration date when consumers lost the full value of their CC. *See id*; FAC ¶¶ 14, 30,

8    67, 77, 81.

9        Accordingly, Plaintiff Cerrato plausibly alleges violations of both EFTA and Cal. Civ.

10   Code § 1749.5, which also serve as predicate offenses for the UCL claim.

11   **VI.    PLAINTIFFS PLAUSIBLY ALLEGE A BREACH OF EXPRESS AND IMPLIED WARRANTY**

12

13       Defendant argues "Plaintiffs also fail to plead an actionable breach of an express or implied

14   warranty." MTD at 27. Defendant is wrong.

15       California courts "have repeatedly held that stating a claim under California consumer

16   protection statutes is sufficient to state a claim for express warranty." *Hadley v. Kellogg Sales Co.*,

17   273 F. Supp. 3d 1052, 1095 (N.D. Cal. 2017); *see also James v. Chocmod USA Inc.*, 2025 WL

18   950509, at *11 (E.D. Cal. Mar. 28, 2025); *Mendoza v. Procter & Gamble Co.*, 707 F. Supp. 3d

19   932, 943 (C.D. Cal. 2023); *Goodwin v. Walgreens, Co.*, 2023 WL 4037175, at *4 (C.D. Cal. June

20   14, 2023). Moreover, a breach of implied warranty of merchantability can be asserted ***both*** by

21   alleging "(1) the product is not fit for the ordinary purposes for which such good [is] used, or (2)

22   does not [c]onform to the promises or affirmations of fact made on the container or label if any."

23   *Hadley*, 273 F. Supp. 3d at 1095-96 (internal citations and quotations omitted). "When an implied

24   warranty of merchantability cause of action is based solely on whether the product in dispute

25   '[c]onforms to the promises or affirmations of fact' on the packaging of the product, the implied

26   warranty of merchantability claim rises and falls with express warranty claims brought for the same

27   product." *Id.* at 1096 (internal citations omitted).

28

1       Here, Plaintiffs base their claims of breach of express and implied warranty on the

2   "promises or affirmations of fact on the packaging of the product," FAC ¶¶ 186, 192, and therefore,

3   the same analysis as to the sufficiency of their claims under California consumer protection statutes

4   applies here. *See Hadley*, 273 F. Supp. 3d at 1095-96; Section III (discussing the adequacy of

5   Plaintiffs' CLRA, FAL, and UCL claims). For the same reasons discussed in Section III, Plaintiffs

6   sufficiently allege their express and implied warranty claims. *See id*.

7       Because Plaintiffs do not base their claims on the product not being fit for its ordinary

8   purpose, Defendant's arguments to that effect are irrelevant. *See* MTD at 28-29. Further,

9   Defendant's arguments that it disclaimed an implied warranty through its Terms of Use, MTD at

10  29, fail because Defendant did ***not*** provide ***conspicuous*** disclaimers through its Terms of Use. *See*

11  Section II.B., (discussing the lack of notice of the Terms of Use and inappropriate reliance on

12  documents outside of the FAC).

13      Accordingly, the Court should deny the MTD for failure to state a claim for express and

14  implied warranties.

15                                      <u>**CONCLUSION**</u>

16      For these reasons, the Court should deny Defendant's motion to dismiss in its entirety.

17  Dated: May 27, 2025                          Respectfully submitted,

18                                               **BURSOR & FISHER, P.A.**

19
                                                 By:   */s/ Stefan Bogdanovich*
20                                                       Stefan Bogdanovich

21                                               Neal J. Deckant (State Bar No. 322946)
                                                 Stefan Bogdanovich (State Bar No. 324525)
22                                               Ines Diaz Villafana (State Bar No. 354099)
                                                 1990 North California Blvd., 9th Floor
23                                               Walnut Creek, CA 94596
                                                 Telephone: (925) 300-4455
24                                               Facsimile: (925) 407-2700
                                                 E-mail: ndeckant@bursor.com
25                                                       sbogdanovich@bursor.com
                                                         idiaz@bursor.com
26

27                                               *Attorneys for Plaintiffs*

28